1      UNITED STATES DISTRICT COURT

2      EASTERN DISTRICT OF NORTH CAROLINA

3

UNITED STATES OF AMERICA,        )
4                                 )
         Plaintiff,               )      DOCKET NO. 7:22-cr-00005-D-1
5                                 )
     VS.                          )
6                                 )
CHRISTOPHER CLARK ARTHUR,         )
7                                 )
         Defendant.               )
8                                 )
_____)

9

10          TRANSCRIPT OF DETENTION HEARING
         BEFORE THE HONORABLE ROBERT B. JONES, JR.
11          FRIDAY, FEBRUARY 18, 2022; 10:16 A.M.
               WILMINGTON, NORTH CAROLINA

12

13   FOR THE PLAINTIFF:
         United States Attorney's Office
14       By:  Jason Kellhofer, AUSA
         150 Fayetteville Street, Suite 2100
15       Raleigh, NC  27601

16   FOR THE DEFENDANT:
         The Chetson Firm, PLLC
17       By:  Damon Chetson, Esq.
         19 W. Hargett Street, Suite 508
18       Raleigh, NC  27601

19

     Audio Operator:              COURT PERSONNEL
20

21       Proceedings recorded by electronic sound recording,
     transcript produced by transcription service.
22   _____

23              JANICE RUSSELL TRANSCRIPTS
                  1418 RED FOX CIRCLE
24              SEVERANCE, CO  80550
                  (757) 422-9089
25              trussell31@tdsmail.com

1                              INDEX

2
                          Direct      Cross
3    WITNESSES FOR THE
       GOVERNMENT:
4
     Greg Garey               3         49
5

6

7    EXHIBITS:                        Marked    Received

8        US-1-40   Photographs          15        15
           (Exhibit 29 filed under seal)
9
         D-1-8                           51        51
10

11   ARGUMENT:      Mr. Kellhofer                          52

12                  Mr. Chetson                            55

13
     THE COURT:     Finding                                58
14

15

16

17

18

19

20

21

22

23

24

25

1                        P R O C E E D I N G S

2              THE COURT:  All right.  Is this -- is Mr. Arthur's

3    case going forward?

4              MR. KELLHOFER:  It is, your Honor.

5              THE COURT:  Is this a presumption case?

6              MR. KELLHOFER:  It is not, your Honor.

7              THE COURT:  All right.

8              I'll hear first from the Government.

9              MR. KELLHOFER:  Your Honor, with regard to the

10   evidence in this case, we would seek to present the testimony

11   of Agent Greg Garey.

12             THE COURT:  Okay.

13             MR. KELLHOFER:  Mr. Garey, could you please, please

14   stand?

15             THE COURTROOM DEPUTY:  Please place your left hand on

16   the Bible and raise your right hand.

17              GREG GAREY, GOVERNMENT'S WITNESS, SWORN

18             THE COURTROOM DEPUTY:  Thank you.

19                        DIRECT EXAMINATION

20   BY MR. KELLHOFER:

21   Q   Special Agent Garey, can you please briefly provide us with

22   your background?

23   A   I'm a special agent with the FBI out of the Raleigh office,

24   the Charlotte Division.  I've been doing so for over 13 years.

25   I'm also a certified bomb technician and a certified SWAT

1  operator.

2  Q   All right.  And where do you presently, where are you

3  physically located?

4  A   In Raleigh, North Carolina.

5  Q   Are you familiar with this case regarding the defendant who

6  sits here today?

7  A   Yes.

8  Q   All right.  And do you recognize him?

9  A   Yes.

10 Q   All right.  And how did you become aware of his case?

11 A   Our case was initiated based on the results of several

12 search warrants, one of which was in New York, the others being

13 in Richmond, Virginia.  The results of those search warrants

14 revealed, or they recovered multiple, upwards of 13 or 14

15 improvised explosive devices, IEDs, and manuals, which

16 Mr. Arthur, the defendant, drafted, wrote.

17 Q   So let me ask you.  You'd mentioned there were search

18 warrants that took place up in, where at?

19 A   One was in New York.  The others were in Richmond,

20 Virginia.

21 Q   All right.  And were you a participant to those searches?

22 A   I was not.

23 Q   All right.  And what -- what -- what predicated those

24 searches taking place?

25 A   It was a case worked out of Richmond, were subjecting

1  Joshua Blessed.  Mr. Blessed was believed to be a anti-law

2  enforcement, anti-government individual.  He ultimately was

3  a -- he's a 18-wheeler truck driver and was driving from

4  Richmond to New York and was attempted to be pulled over by New

5  York State Police.  Police pursuit occurred multiple hours and

6  a gun battle, I believe over 120 some odd rounds were fired,

7  and Mr. Blessed was ultimately shot and killed by law

8  enforcement.

9  Q    All right.

10 A    Subsequently, we served the search warrants.

11 Q    And as a result of those events, subsequent searches took

12 place?

13 A    Yes.

14 Q    And what were those searches of?

15 A    His tractor trailer that was involved in the pursuit and

16 the shooting.  That was the one in New York.  The other was his

17 personal vehicle, which was located in Richmond, and then his

18 residence, which was also in Richmond.

19 Q    All right.  And relevant to your investigation of Defendant

20 Arthur, what was located at those searches?

21 A    Multiple IEDs, I believe up, upwards of 13 or 14 improvised

22 explosive devices and manuals, again like I mentioned before

23 that Mr. Arthur wrote, and those manuals provided detailed

24 instructions how to make the IEDs which were recovered.

25 Q    All right.  Do you recall the names of those manuals?

1  A   I believe one was Improvised Explosives.  The other one was

2  -- I can't recall the second one -- Militaristic Force, I

3  believe was the general basis.

4  Q   All right.  And those manuals in relation to the IEDs that

5  were located, how, how were those manuals relevant?

6  A   They detailed how to make the IEDs, pipe bombs.  And then

7  the ones that were recovered during the searches of Joshua

8  Blessed's vehicles and residence were all consistent with the

9  step-by-step procedures of how to make them in the manual.

10 Q   All right.  And the manuals themselves, were they, you

11 know, stated as authored by the, by the defendant?

12 A   Correct, yes.

13 Q   Okay.

14     And so what did your investigation do then?

15 A   So we started our investigation with the standardized, you

16 know, baseline checks.  We utilized the grand jury for

17 *subpoenas*, we did search warrants, and then we ultimately was

18 able to establish a confidential human source to create a

19 relation with Mr. Arthur.

20 Q   Okay.

21     Were you able to locate the cellphone, or was the FBI, I

22 suppose, able to locate the cellphone of Mr. Blessed, the

23 individual who had been shot and killed during the shootout?

24 A   Yes.  They, they located during the searches.  It took a

25 while to examine it, but ultimately, yes, the results came

1  back.

2  Q    And were the results of those pertinent to your

3  investigation of --

4  A    To our --

5  Q    -- Mr. Arthur?

6  A    Yes, sir.

7  Q    How so?

8  A    Cellphone records indicate with both location and e-mail

9  traffic that Mr. Blessed went, traveled from Richmond to Mount

10 Olive, North Carolina to Mr. Arthur's residence and trained

11 with Mr. Arthur for several days.

12 Q    All right.  And you mentioned that you had utilized a CHS,

13 or a confidential human source.

14      Can you tell us how that began?

15 A    Our CHS reached out to Mr. Arthur via his website,

16 TackleberrySolutions.com.  They corresponded several times on

17 e-mail.  That evolved to actual telephone calls and then,

18 ultimately, to a face-to-face meeting.

19 Q    All right.

20      With regard to the -- you, you stated that there was a

21 website?

22 A    Yes, sir.

23 Q    What was the name of the website, again?

24 A    TackleberrySolutions.com.

25 Q    All right.  And that Tackleberry Solutions was operated by

1  whom?

2  A    The defendant.

3  Q    All right.

4       And were any purchases made by the CHS off of the

5  Tackleberry Solutions website?

6  A    Yes.

7  Q    And what did that include?

8  A    The manuals, very consistent to the ones that were

9  recovered during the Joshua Blessed search warrants, and those

10 manuals included a thumb drive which had videos.

11 Q    All right.  Did you -- you -- you personally reviewed those

12 manuals?

13 A    Yes.

14 Q    All right.  And you reviewed the videos on the thumb drive?

15 A    Yes.

16 Q    And can you provide us a description, just briefly, of

17 what, what, what was contained therein?

18 A    Yeah.  The multiple videos and summary of how to defend

19 one's house; how to set up things called spiderwebs or fatal

20 funnels; how to evade escape, law enforcement; how to survive

21 on the land.

22 Q    All right.  And was there further contact between the

23 source and the defendant other than that purchase online?

24        THE COURT:  What was your question?

25 BY MR. KELLHOFER:

1  Q    Other than the, the purchase online, was there any further

2  contact between the source and the defendant?

3  A    Yes.  They, they e-mailed and, they e-mailed several times

4  and continued to converse via telephone, just making telephone

5  calls.

6  Q    All right.  And did they -- what, what was the gist of, of

7  those conversations?

8  A    Continuing to discuss the, the source's need for

9  Mr. Arthur's expertise and then lining up a potential face-to-

10 face training.

11 Q    All right.  And did a face-to-face meeting take place

12 between the FBI source and the defendant?

13 A    Yes.

14 Q    All right.  And during that meeting what discussion took

15 place?

16 A    The source ultimately request -- in summary, the source

17 ultimately spoke to Mr. Arthur about his need to, the fact that

18 the ATF came to his house and took inventory and --

19 Q    And ATF is the --

20 A    Alcohol, Tobacco, and Firearms --

21 Q    All right.

22 A    -- agency.

23 Q    All right.  So the source had told the defendant that ATF

24 had come to his house?

25 A    Yes.

1  Q    Okay.  And, and please go on.

2  A    That they took inventory and he needed to know what steps

3  he should take next.

4  Q    Okay.  When you say "took inventory" --

5  A    Yes.

6  Q    -- meaning that, that a search of his house had taken

7  place?

8  A    That was presumed, yes.

9  Q    Okay.

10      All right.  And what, what further discussion about the ATF

11  then occurred?

12  A    Mr. Arthur informed the source obviously has two options to

13  -- to -- one to be where he shouldn't be or to stand and fight.

14  Q    All right.  And was further discussion --

15  BY THE COURT:

16  Q    What -- what was the -- what did you say?

17  BY MR. KELLHOFER:

18  Q    -- then --

19  BY THE COURT:

20  Q    What was your first, what was the first one?

21  A    To, to be where you should not be, meaning to, to basically

22  run or flee, move.

23  BY MR. KELLHOFER:

24  Q    And with regard to the other option of stand and fight, did

25  any discussion take place about how that would occur?

1    A    Yes.

2    Q    And what did that include?

3    A    It evolves back to this technique or, or theory behind the

4    spiderweb or creating fatal funnels on your property, setting

5    up perimeter charges, explosives, around the CHS' house,

6    installing explosives in the walls ultimately to, to, to render

7    the ATF or any other law enforcement to, when they come to the

8    house, to render them useless, to, to kill them.

9    Q    And you, you used the term "fatal funnel."

10   A    Yes.

11   Q    What is that?  What is that, please?

12   A    It's, it's the ability to concentrate law enforcement down

13   to a small area versus spread out, a large, amongst a larger

14   area giving the opposite side the ability to, to, effectively,

15   kill more people.

16   Q    And you mentioned the term "spiderweb" techniques.  What

17   does that entail?

18   A    It was a term that the defendant used in, in multiple

19   videos and in manuals.  And that's, I believe the quote was

20   it's creating a "death box," how you can effectively kill more

21   people without exposing yourself and do it with, essentially,

22   one person against an entire SWAT team.

23   Q    Now as to the materials that would be necessary for

24   creating such explosives, did Mr. Arthur provide the source any

25   direction or guidance as to obtaining such materials?

1  A    Yes.

2  Q    What did that entail?

3  A    Mr. Arthur actually showed the CHS how to create what he

4  considered an electronic blasting cap.  They went to the shed

5  and you can picture a lightbulb, a small lightbulb, maybe from

6  an automotive, a vehicle, and file pieces, the end off of the

7  lightbulb and filled it with smokeless powder from, you know,

8  like a shotgun shell or from a bullet, and was able to show him

9  how to attach the wires to the lightbulb, ultimately creating

10  an improvised initiator for the explosive, for the IED.

11  Q    And in terms of purchasing materials or items that would be

12  needed for these explosives, did Mr. Arthur describe any need

13  to be covert in doing so?

14  A    Yes.

15  Q    And then secondarily, if an event were to occur, did they

16  discuss the possibility of an arrest?

17  A    Yes --

18  Q    In --

19  A    -- how to evade one.

20  Q    In what, in what way did they discuss how to handle the

21  possibility of an arrest?

22  A    Again, just how to evade with your family properly in, in

23  his mind.  It all evolves back to the spiderweb or the fatal

24  funnel creating chaos and then having vehicles staged on the

25  outskirts of your property and then, you know, you create a, I

1  think the term was a "rabbit" while your family is running

2  away.  You're drawing the law enforcement's attention and then

3  ultimately, you link it back up with your family.

4  Q   And these communications between the source and the

5  defendant, were they recorded?

6  A   Yes.

7  Q   Now an arrest took place in this case after an indictment

8  had been obtained, is that correct?

9  A   Correct.

10  Q   And where did that arrest take place?

11  A   In Raleigh, North Carolina.

12  Q   Okay.  And how was it structured in relation to any

13  searches that took place?

14  A   Can you rephrase that?

15  Q   Where was the defendant arrested, specifically?

16  A   At the Raleigh State Fairgrounds at a gun show --

17  Q   Okay.  And why did that --

18  A   -- in Raleigh.

19  Q   And, and on the same day, were any searches set to take

20  place?

21  A   Yes, two.  One of his vehicle and one of his residence in

22  Mount Olive.

23  Q   All right.  And why, why did the FBI not arrest the

24  defendant at his home?

25  A   We did a threat assessment of Mr. Arthur and his residence

1   and based on the intelligence that we gathered it was too

2   dangerous to arrest Mr. Arthur at his residence.

3   Q   All right.  The arrest, therefore, took place, you

4   mentioned, at the State Fairgrounds?

5   A   Yes, sir.

6   Q   All right.  And what was going on at that -- at that --

7   A   A gun show.

8   Q   Okay.  And why was Mr. Defendant, or why was Mr. Arthur,

9   the defendant, going to be there.

10  A   To meet our CHS.

11  Q   And what was the purpose of that meeting?

12  A   To provide manuals to individuals, to other folks inside

13  the gun show.

14  Q   And was that something that the defendant believed based on

15  statements to him from the source?

16  A   Yes.

17  Q   So he essentially believed that he was going to be selling

18  more manuals?

19  A   Correct.

20  Q   All right.  Can you just briefly tell us about the arrest

21  of the defendant?  Exactly what took place?

22  A   The defendant showed up to meet our source.  They met just

23  directly outside of the entrance.  There's two entrances to the

24  gun show, one being for any person to go in; the second being

25  for folks that were bringing firearms.  Both had metal

1  detectors.  They went into the second one.  The, the CHS

2  brought a firearm with him and that was to force both the CHS

3  and the defendant through the metal detector in a separate room

4  which housed the SWAT team and after they secured the source's

5  weapon and then both went through the metal detector to confirm

6  they weren't armed, he was approached and placed into custody.

7  Q    Did he immediately comply?

8  A    Not immediately.

9  Q    And, and how so?

10  A    They -- I wasn't a witness, but based on the information

11  that I was informed as they approached him he retracted his

12  arms and would not comply with the, the demands of the

13  arresting agents so that they had to put him, place him on the

14  ground in order to secure him safely.

15  Q    All right.  And parallel, a, to, to these events, a search

16  was set up to take place of the defendant's residence, correct?

17  A    Yes.

18  Q    All right.  And did that take place?

19  A    That did.

20  Q    All right.

21       MR. KELLHOFER:  Your Honor, I have a number of

22  photographic evidentiary items marked Government's Exhibits 1

23  through 40.  If I may approach the witness.

24       THE COURT:  Have you seen these, Mr. Chetson?

25       MR. CHETSON:  Yes, your Honor.  I'm fine with them

1  coming in.

2            THE COURT:  Okay.

3            Go ahead.

4            MR. KELLHOFER:  If I might provide a copy to the Court

5  as well?

6            THE COURT:  All right.

7        (Government Exhibits 1 through 40 provided to the Court and

8  witness)

9  BY MR. KELLHOFER:

10  Q    Sir,  have you reviewed these photographs

11  A    Yes.

12  Q    All right.  And do they pertain to the search that took

13  place?

14  A    Yes, sir.

15  Q    All right.  If you could just take a look at Government's

16  Exhibit 1, please?

17  A    Okay.

18  Q    And orient the Court.  What is that a photograph of?

19  A    It's a photograph of an overview of Mr. Arthur's residence

20  and his property.  Directly on the left=hand side you could see

21  that it's Carter Thigpen Road.  So we're staring at what would

22  be the front of the house and the right side of the house, the

23  front being the door on the, essentially, the left side of the

24  photograph.

25  Q    All right.  And to your knowledge, is that door actually

1  utilized for entry and exit into the home?

2  A    No.

3  Q    Okay.  And what, where is that entry/exit door then

4  utilized?

5  A    The, the awning that's on the right-hand side of the house.

6  Q    All right.

7       And if you take a look at Exhibit 2, is that a closer photo

8  of that awning?

9  A    Yes, sir.

10  Q    All right.  And did the FBI eventually enter the house

11  through that awning area?

12  A    Yes.

13  Q    All right.  We'll turn back to that in a second.

14       But behind the home was there areas that were searched as

15  well?

16  A    There was.

17  Q    And what did it essentially include?

18  A    A shed, outbuilding.

19  Q    All right.  Take a look at Government Exhibit 3.  Is that

20  that shed that you're referring to?

21  A    The one that's directly in the middle of the photograph,

22  the white one, yes.

23  Q    All right.

24       And as to that shed, from the other side, if you'd take a

25  look at Government Exhibit 4, is that that other side of that

1  shed?

2  A    Yeah.  In the, in the background with the red wheelbarrow

3  propped up against the side.

4  Q    Okay.  And what is located all around the shed and then

5  around the corner of the home there?

6  A    A stack of sandbags establishing what Mr., the defendant

7  considered the fighting positions.

8  Q    And is that based on his conver -- you -- are you stating

9  that based on his conversations with the source?

10  A    Mainly from his videos.

11  Q    I see.

12      With regard to those sandbags as well, if you take a look

13  at Exhibit 5.  And you'll see there's an evidentiary marker

14  there, 5, of a little bottle.

15      Can you explain what that is?

16  A    It's believed to be filled with Tannerite.  They, they

17  field tested it and consistent with an exploding target

18  material.

19  Q    All right.  And is that the location it had been found out?

20  A    Yes.

21  Q    If you take a look at Government Exhibit 6, that is the

22  shed you were referencing, correct?

23  A    Yes, sir.

24  Q    All right.  And is that further fighting position or

25  sandbags set up in the front of it as well?

1  A    Yes.

2  Q    All right.  And did you eventually search that shed?

3  A    We did.

4  Q    All right.  Were any items of, of evidentiary value

5  located?

6  A    Yes.

7  Q    Okay.  We'll turn back to that in a second.

8       Did you search the back of the property other than just the

9  home residence and the shed?

10 A    Yes.

11 Q    All right.  If you take a look at Government Exhibit 7.

12      What, what is that, please?

13 A    That is the backside of an ammo can, a metal ammo can

14 sitting on a, a bipod or a, a stand.

15 Q    All right.

16      And if we look at Government Exhibit 8, is that the front

17 of that ammo can set up there?

18 A    That would be the view, yeah, the front view also seen from

19 the residence or the shed.

20 Q    All right.  And what is there on the front of the can and,

21 and do you have a, an understanding of why that's there?

22 A    It is a red-colored paint spray spot and it's believed to

23 be an aiming point to shoot at from, from the residence or the

24 shed.

25 Q    Okay.

1      Government Exhibit 9, then.  Is that the inside of that

2  can?

3  A    Yes.

4  Q    And what was contained within there?

5  A    More of the Tannerite-style exploding target material.

6  Q    All right.  And what would occur if one were to shoot that

7  red target?

8  A    The ammo, the Tannerite would explode causing the ammo can

9  to fragment into pieces known as shrapnel.

10  Q    Now Government Exhibit 2 was the, the home residence and

11  you stated that that awning is where the FBI had entered the

12  residence, correct?

13  A    Yes, sir.

14  Q    All right.  And by "FBI," you'd mentioned that you yourself

15  were trained in explosive ordinances?

16  A    Yes.

17  Q    Was there -- and I believe EODs?  What does EOD stand for?

18  A    Explosive Ordinance --

19  Q    Okay.

20  A    -- Disposal.

21  Q    And does FBI have EOD teams?

22  A    Yes.

23  Q    All right.  And was EOD present to assist in the search?

24  A    FBI and State Bureau of Investigations, North Carolina

25  State Bureau of Investigations Bomb Unit.

1  Q    All right.  So FBI and SBI EOD-trained individuals?

2  A    Yes.

3  Q    Okay.

4       So this entrance area now at Government Exhibit 10, that's

5  where you entered.  Can you please explain what that is right

6  there where that hole is at?

7  A    As the FBI SWAT team approached the house, a white-colored

8  bucket was sitting essentially where that hole is.  One of the

9  EOD technicians looked inside that white-colored bucket and saw

10 a pipe bomb pointing directly out towards the yard and then

11 behind the pipe bomb, in between the house and the pipe bomb,

12 was a bunch of sand.

13 Q    All right.  And what did they do about that?

14 A    We, obviously knowing we could not pass that bucket in

15 order to get into the residence, the EOD technician placed an

16 explosive charge next to that white bucket in order to move it

17 out of the way allowing safe access to and from the house.  In

18 doing so, it destroyed the white bucket.  The sand was all over

19 the, the, the deck.  It caused a large hole to be, a large hole

20 in the deck and then the gray in color wire which was attached

21 to the pipe bomb was, was pulled up.

22 Q    I see.  So that wire there, that was pre-existing.  That

23 was already there?

24 A    Yes.

25 Q    And it ran underneath the home?

1  A    Underneath the home attached to the pipe bomb in the

2  bucket.

3  Q    Okay.  All right.  And did the FBI or EOD follow where that

4  wire went?

5  A    Yes.  Once it was, once we, we determined it'd be safe to

6  pass, we traced that wire.

7  Q    All right.  And so the, the little pieces of white plastic

8  that are laying around that hole, that, that's the remains of

9  that bucket?

10  A    Yes, sir.

11  Q    All right.  And the sand is from the sandbag that was

12  placed up by the house?

13  A    The sand was inside the bucket.

14  Q    Oh, I see.

15  A    And, and when I -- it, it was inside the bucket, but it was

16  in the back portion and pointing towards the house.  So the

17  pipe bomb was on the opposite side.  And that's significant

18  'cause he was -- Mr. -- the defendant's intent was to create a

19  directional or a shape charge.  So --

20  Q    Which would project away from the home --

21  A    Correct.

22  Q    -- whoever was entering the house, I take it?

23  A    Correct.

24  Q    I see.

25      All right.  If you would take a look at 11, please.  That's

1  just a, a closeup of that hole, is that correct, and the wire?

2  A   Yes, sir.

3  Q   All right.

4      If you look at 12.  Now if we can orient ourself, that's

5  inside the home, correct?

6  A   It is.

7  Q   All right.  And to the left we can see the, that's the

8  entrance, that deck that we were just looking at?

9  A   Correct.

10 Q   All right.  So as you enter the home there, are there, is

11 there any, any items of relevance to this photo?

12 A   Several.  I'll draw your attention to the tapestry that's

13 hanging on the wall with the deer.  That's used in several

14 background for his videos.

15 Q   Okay.  So the videos you observed, that's just where he was

16 apparently --

17 A   Standing.

18 Q   -- standing?

19 A   Yes, sir.

20 Q   All right.  Anything else?

21 A   And then just to the left of the tapestry was the hall or

22 that bookshelf which is leading towards the bedroom.  That

23 bookshelf is of significance.

24 Q   All right.  So let's turn to that, then.

25     And Exhibit 13 is closer to that bookshelf, is that

1  correct?

2  A    Yes, sir.

3  Q    All right.  First orienting ourselves a little farther, if

4  you continued to walk through, it looks like there's a door

5  there with some light coming out.  What is that?

6  A    That ultimately is the, the front door, the, the door that

7  was not utilized to go in and out of the residence.

8  Q    All right.  And is that a bedroom?

9  A    That is the master bedroom.

10 Q    Okay.  And then there's a little, a little, looks like,

11 door to the left there right past the bookshelf.  What's that?

12 A    That's entrance to the children's room.

13 Q    Okay.  So this bookshelf is on this side of the children's

14 room?

15 A    Correct.

16 Q    All right.

17 A    Children's room is directly behind the bookshelf.

18 Q    Okay.  And what's relevant in this photo with regard to the

19 bookshelf that you had noted?

20 A    On the left-hand side of the bookshelf there's a gray in

21 colored junction box with a black and a red wire hanging off of

22 it and then terminals to what I consider alligator clips.

23 Q    All right.

24     And if you take a look at Exhibit 20, or 14.  Is that a

25 closeup of what you just described?

1   A    Yes.

2   Q    All right.  And can you tell us what those wires are?

3   A    The two, the black and the red wire are attached to what

4   you would consider, considered a switch.  The switch has the

5   nine-volt battery inside of it and the wires would ultimately

6   get clipped to that gray in colored house wire that's directly

7   behind the black and red wire.  That is what is attached to the

8   pipe, the IED that is sitting, that was sitting on the porch.

9   Q    All right.  So the wire that was out on the porch runs

10  under the home, then runs back up into here and this is where

11  that wire terminates?

12  A    Yes.

13  Q    All right.  And these alligator clips could be connected to

14  that wire to create a switch?

15  A    Yes.

16  Q    All right.

17       If you take a look at next exhibit, please, 16.  Is that

18  the switch you were referencing?

19  A    Yes.

20  Q    All right.  And that's in a, it looks like an electrical

21  gang box?

22  A    Correct.

23  Q    All right.  What's behind that switch --

24  A    The nine --

25  Q    -- in the gang box?

1  A    Nine-volt battery.

2  Q    All right.  So in order -- so I guess -- how does that all

3  go together with regard to the IED on the, on the front porch?

4  A    The design of the IED was, utilized that same, he

5  considered, the defendant considered an electronic blasting

6  cap.  It's an improvised cap that he showed the source how to

7  make.

8       So lightbulb with flashless, smokeless powder inside, and

9  that's your initiator.  The initiator is in contact with an

10 additional amount of smokeless powder which is then capulate,

11 encapsulated into a pipe, a galvanized pipe with two endcaps.

12 So once you attach all the wires together and you flip the

13 switch, the electricity travels down through the wires

14 ultimately to that lightbulb which heats up the element of the

15 bulb causing the smokeless powder to ignite and then combust

16 and create an explosive of the pipe.

17 Q    All right.

18      Moving into the bedroom that you'd noted, the master

19 bedroom, is that what we see at Government Exhibit 16?

20 A    Yes.

21 Q    All right.

22      And Government Exhibit 17, those are what?  What do we have

23 there?

24 A    Several items that we recovered in the master bedroom.

25 Q    All right.  And so it looks like 28.  That's just a

1  handgun, correct?

2  A    Yes.

3  Q    All right.  26.  What, what is 26?  What's in there?

4  A    I believe that's -- it's tough to see.  I believe 26 was a

5  knife.  I may be --

6  Q    Okay.

7  A    -- incorrect on that.

8  Q    All right.  Well, I'm most interested in 27 and 40.

9       Can you tell us what 27 is?

10 A    27 is an assault rifle.

11 Q    All right.

12      And let's take a look at the next exhibit, Exhibit 18.  Is

13 that that assault rifle?

14 A    It is.

15 Q    All right.  Is there anything particularly pertinent with

16 regard to this assault rifle?

17 A    We had a certified NFA examiner test the weapon and, and do

18 his examination.  It was determined to be considered a short-

19 barrel rifle and with a silencer on the end of the barrel.

20 Q    All right.  And short-barrel rifle being an unlawful item,

21 correct?

22 A    Yes.

23 Q    And with regard to the silencer, was this serialized in any

24 way or --

25 A    It was, but the serial was defray or painted over.  You

1  were unable to, to see the actual serial number.

2  Q   All right.  Any evidence that this was registered in any

3  way?

4  A   No evidence.

5  Q   And then other firearms were located, correct?

6  A   Yes.

7  Q   All right.  You had the handgun that we, we'd just seen a

8  moment ago.

9      If you take a look at Government Exhibit 19.  Are those

10  some of the other firearms?

11  A   Yes.

12  Q   All right.  And, and ammunition as well?

13  A   Correct.

14  Q   All right.

15     And then I'd noted No. 40 that had been on the bed.  Is

16  that what we see again at Exhibit 20?

17  A   It is.

18  Q   All right.  The one that had evidentiary marker 40 on it?

19  A   Yes, it is.

20  Q   Okay.  And what, what is that?

21  A   Consider -- it's a plate carrier.  So he has ceramic or

22  rifle-style protection plates and a carrier.

23  Q   And when you say that, is that essentially body armor?

24  A   It's body armor.

25  Q   Okay.

1  BY THE COURT:

2  Q    Go back to, go back to 19.

3       What is 32?

4            THE COURT:  Did you ask him what 32 and 35 were?

5            MR. KELLHOFER:  No, sir.  I did not.  I apologize.

6  BY MR. KELLHOFER:

7  Q    32, sir?  Is that a -- well, go ahead.  What is that?

8  A    A rifle.

9  Q    All right.

10      And 35 is?

11 A    Another pistol.

12 Q    All right.  And do you recall what's at 34?  I know the --

13 you can't see it quite well.

14 A    I believe that -- is that 34 to the right or 33?

15      Are we on Exhibit 19 still?

16 Q    Yes, at the top where, where it has an evidentiary

17 marker --

18 A    Oh, oh, oh, I'm sorry.

19 Q    -- 34.

20 A    I believe that's another pistol.

21 Q    All right.  And each of these, to your knowledge, were,

22 were, were lawfully-owned firearms, though?

23 A    Yes.

24 Q    Okay.

25 BY THE COURT:

1  Q   Do you know what caliber the rifle is?

2  A   I do not off the top of my head.

3  BY MR. KELLHOFER:

4  Q   And then -- you can't quite see, but a little bit of an

5  angle, 33 on there as well, is just the other firearm?

6  A   Another firearm.  Whether it's a rifle or a shotgun, I, I'm

7  unable to tell from this photo.

8  Q   Okay.

9     You were talking about Government Exhibit 20, the -- it had

10  -- it's a kit containing body armor.  And was there anything

11  else of relevance in this kit?

12  A   It contained three additional, more pipe bombs, IEDs.

13  Q   Okay.  And that's a little piece of, which looks like, you

14  know, for striking matches.  What, what is that?

15  A   It's a piece of wood with exactly that.  It's the other

16  side of, you know, a matchbox.  And that was utilized to use,

17  how he set up the pipe bombs that are located on his kit.  You

18  strike one end of that against that piece of wood with the

19  striker plate and throw it.  That's how it's initiated.

20  Q   Okay.  So that -- that's -- it's a piece of wood with the

21  other side of a matchbox that's been, looks like, cut out and

22  glued on or something?

23  A   Yes.  And then tied to his body armor.

24  Q   Okay.  And, and those two pouches there that were co-

25  located contained, you stated, three IEDs?

1    A    Somewhere, yeah, throughout the, the, the body armor, is

2    three additional IEDs.

3    Q    All right.  Let's take a look at Government Exhibit 21.  Is

4    that the IEDs you were mentioning?

5    A    Yes.

6    Q    All right.  And in terms of how these are constructed, how,

7    how are these constructed?

8    A    One side has the external endcap of a pipe, all galvanized

9    steel.  The other side has several matches, just the matchheads

10   exposed, and they're connected to what we consider a can infuse

11   or time fuse and it's all filled with smokeless powder.

12   Q    All right.  And if you look at Government Exhibit 22.  Is

13   that the, one end of those three IEDs?

14   A    Yes.

15   Q    All right.

16        And then Exhibit 23, what, what is that?

17   A    Once you remove that blue-colored tape, it exposes the

18   matchheads.

19   Q    All right.  And in order to ignite this you would

20   essentially just strike it to that strike plate that was

21   attached?

22   A    Yes.

23   Q    Can you tell us what Government Exhibit 24 is?  It contains

24   an evidentiary marker from the search, 38.

25   A    United States Marshal's badge.

1   Q   All right.  And from your investigation, at any time was

2   the defendant a member of the United States Marshals?

3   A   No.

4   Q   With regard to the bedroom, there was a safe in there as

5   well, correct?

6   A   Yes.

7   Q   All right.  And if you take a look at Government Exhibit

8   25, is that, is that from on top that safe?

9   A   It is.

10  Q   All right.  And what is that?

11  A   That's a document titled America's God's Land of Liberty.

12  Q   All right.  And were there any other copies of that

13  document located throughout your search?

14  A   Yes.

15  Q   All right.

16      If we take a look at Government Exhibit 26, what is that?

17  A   The overview photo of the shed that was located in the back

18  of the property.

19  Q   Okay.  So now you're searching inside the shed?

20  A   Yes.

21  Q   All right.  And there's some markers there.

22      So if we take a look at Government Exhibit 27.  What are

23  those two evidentiary markers for?

24  A   Marking the handwritten -- a stack of notes, two of which

25  were handwritten.

1  Q   All right.  And then No. 2 looks to be some media device?

2  A   Yes, a laptop.

3  Q   Okay.  So Evidentiary Marker 1 there has a stack of papers?

4  A   Yes.

5  Q   Is that in any way relevant to the America's God's Land of

6  Liberty item that was located also in his master bedroom on his

7  safe?

8  A   Yes.

9  Q   How, how so?

10 A   First document that's handwritten is just, is a list of

11 questions and it's referencing things that are in that article

12 that you're, that we're mentioning.

13 Q   All right.  And within that stack was a copy of that

14 America's God's Land of Liberty --

15 A   Yes.

16 Q   -- within that stack as well?

17 A   Yes.

18 Q   All right.  So let's talk briefly about that stack.

19     First of all, the, the piece that's slightly pulled out,

20 what is that?

21 A   That is a hand-drawn schematic map, a floorplan of Duplin

22 County Sheriff's Office.

23 Q   Okay.  And that floorplan, is there any -- do you have

24 any --

25          THE COURT:  Sorry.  What exhibit is this you're on?

1              MR. KELLHOFER:  I'm sorry.  I apologize.  We're on

2      Government Exhibit 27.

3              THE COURT:  Okay.

4      BY MR. KELLHOFER:

5      Q    So that piece that's pulled out appears to you from your,

6      your investigation to be a hand-drawn floorplan from, from

7      where?

8      A    Duplin County Sheriff's Office.

9      Q    And did your investigation provide any reason to believe

10     that the defendant would, would know those floorplans or have

11     ever been in there?

12     A    Yes.

13     Q    How so?

14     A    He was employed by Duplin County Sheriff's Office.

15     Q    Okay.

16         And so if we take a look now at that stack, at Government

17     Exhibit 28, you reviewed this, correct?

18     A    Yes.

19     Q    All right.  And that contains that stack?

20     A    Yes.

21     Q    And on the top what was, is this the document that was at

22     the top of the stack?

23     A    This is the top document.

24     Q    Okay.  And what does the top document state that it is?

25     A    Interrogation No. 1: Bateman.

1  Q   All right.  And by virtue of it being No. 1, did that give

2  you any indication?

3  A   One of several.

4  Q   All right.

5  A   Not the only one that's in existence.

6  Q   And Interrogation No. 1, the name Bateman, does the name

7  Bateman mean anything to you?

8  A   Yes.

9  Q   All right.  And is that -- is your knowledge of that based

10 on these documents themselves?

11 A   Yes.

12 Q   All right.  So in Government Exhibit 28, if you would

13 please look at Page 30, how is that relevant to this being an

14 interrogation of Bateman?

15 A   The Honorable Judge Bateman III.

16 Q   All right.  So this is an order from the Honorable James

17 Bateman III, apparently the district court judge, is that your

18 understanding?

19 A   Yes.

20 Q   And what is this order?  If you look at Page 29, what is

21 this order?

22 A   It has to do with a custody battle between the defendant's

23 wife, Amy Arthur, and her ex-husband, Benjamin Powell.

24 Q   So the plaintiff in this case was, was Benjamin Powell?

25 A   Yes.

1  Q   Who, who is that?

2  A   Amy Arthur's, the defendant's wife, ex-husband.

3  Q   Okay.  And the defendant in that instance is Amy Arthur and

4  she is the defendant's wife?

5  A   Yes.

6  Q   All right.  And this was a warrant directing law

7  enforcement to take immediate physical custody of children?

8  A   Yes.

9  Q   All right.  So from your understanding, this is an

10 interrogation of Judge Bateman who ruled on a warrant to take

11 physical custody of the defendant's wife's children?

12 A   Yes.

13 Q   Question No. 3 states, "What did Elizabeth pay you?"  Do

14 you have any idea who Elizabeth is based on these documents?

15 A   The plaintiff, Benjamin Powell's, attorney.

16 Q   All right.

17         THE COURT:  I'm sorry.  I lost you.  Question 3?

18         MR. KELLHOFER:  Yes, sir, Question 3.

19         THE COURT:  On Page 1 of Exhibit 28?

20         MR. KELLHOFER:  28.  The, the document entitled

21 Interrogation states, "What did Elizabeth pay you?"

22 BY MR. KELLHOFER:

23 Q   And who do you believe Elizabeth to be?

24 A   The plaintiff, Benjamin Powell's, attorney.

25 Q   All right.  And if you look at Page 3 of this document, of

1  Government Exhibit 28, is that where you draw that conclusion

2  from?

3  A   Yes.

4  Q   All right.  And this Page 3 is, essentially, with regard to

5  the custody battle involving Benjamin Howell, Benjamin Powell

6  and Amy Arthur and you'd agree that's it states Elizabeth

7  Stephenson is the plaintiff's attorney?

8  A   Yes.

9  Q   All right.  So this is, then, an interrogation, including

10 questioning the judge as to whether or not the plaintiff's

11 attorney had paid him?

12 A   Correct.

13 Q   And do you believe that relevant to his Question 3(b)?

14 A   I do.

15 Q   And how so?

16 A   3(b) states, "When did you take your first bribe?"

17 Q   All right.  And is that, then, further buttressed by the

18 arrow that's starred and goes down to 3(c)?

19 A   It is.

20 Q   All right.  And then further interrogation plans involved

21 Question 7.  And what is that?

22 A   "Can you" -- the question states, "Can you produce evidence

23 of Amy's guilt?"

24 Q   All right.  Now Question 9 states, "Dec of Independence

25 states," and then it's got a quote, "when long train of abuse,"

1  and it looks like it has some ellipses for further quote.

2      Are you familiar with that quote?

3  A    Yes.

4  Q    Are you familiar with that quote as a result of this

5  document?

6  A    Yes.

7  Q    All right.  On this document, if you could look at Page 25,

8  and the fourth paragraph.

9      Well, first of all, what, what is 25 within this document?

10 A    It's titled My First Address to the Nation.

11 Q    All right.  And this is part of -- well, let me just ask

12 you.

13     Go ahead and read Paragraph 4, please.

14 A    (Reading):

15     "The Declaration of Independence states, 'But when a long

16 train of abuses and usurpations, pursuing invariably the same

17 Object evinces a design to reduce them under absolute

18 Despotism, it is their right, it is their duty, to throw off

19 such Governments, and to provide new Guards for their future

20 security."

21 Q    All right.  And so it appears that, you'd agree, from

22 Question 9 the intent was to inform Judge Bateman of the

23 Declaration's statement and -- and -- being that statement?

24 A    Yes.

25 Q    And then on No. 10 it states that he would read the tyranny

1  law.  Do you have any idea what that would reference, what

2  tyranny law he's referencing?

3  A    I do.

4  Q    All right.  And that's from this document, again?

5  A    Yes.

6  Q    So if you look at Page 9 of this document, does that

7  include -- well, actually, let's take a look at Page 8.  This

8  is the Federal Laws of America, The Land of Liberty, correct?

9  A    Correct.

10 Q    All right.  And this, from your review, appears to be the

11 document created by the defendant?

12 A    Yes.

13 Q    And No. 2 involves tyranny.  Can you tell us what the

14 definition as this document states it to be?

15 A    "Tyranny being defined as any action taken by a governing

16 body, agent of the Government, working on behalf or said

17 Government, corporation, organization, company, LLC, or anyone

18 in a position of power and authority to remove, destroy,

19 pervert, or alter in any way an individual's -- this applies to

20 all human beings regardless of race, nationality, creed, age,

21 birth, religion, etc. -- right to life, liberty, pursuit of

22 happiness, or property without full due process under the

23 Constitution."

24 Q    All right.  So the intent appears to have been to read that

25 tyranny law.

1    And how does this, then, conclude at No. 11?

2  A    No. 11 states, "Allow God to find him guilty or otherwise

3  and pass judgment."

4  Q    And do you know what passing judgment would have included?

5  A    I do believe based on the tyranny penalty.

6  Q    All right.  So let's look back then at Page 9 where you'd

7  read tyranny.  There are penalties there as well?

8  A    Yes.

9  Q    And what do they include?

10 A    "If found guilty of this charge in a court of law,

11 violators will be branded, stripped of all property,

12 constitutional rights, and exiled or publicly hung by the neck

13 until dead.  The choice is up to the presiding judicial

14 official."

15 Q    All right.

16    I'd like you to take a look, then, at Government Exhibit

17 29.

18         MR. KELLHOFER:  And, your Honor, as this entails, I

19 suppose, PII, I, I would ask that this Exhibit 29 be sealed.

20 And I won't --

21         MR. CHETSON:  I have no objection to that if that's --

22         MR. KELLHOFER:  I can have the witness describe what

23 it is without the actual --

24         THE COURT:  Will it -- will this go on the docket as

25 an exhibit?

1          THE COURTROOM DEPUTY:  Just an exhibit list.  The, the

2    documents don't actually go on --

3          THE COURT:  Okay.

4          THE COURTROOM DEPUTY:  -- the docket, so.

5          MR. KELLHOFER:  All right.

6          THE COURT:  You can save it.

7    BY MR. KELLHOFER:

8    Q    So can you just tell us what Government Exhibit 29 is,

9    this, this document?  Where was it obtained, first?

10   A    It was obtained during the search warrant of Mr. Arthur's

11   residence.

12   Q    Okay.  And what does it entail?  At the top, I will note it

13   does state J. Walter Bateman III.

14   A    Yes.

15   Q    And off to the right there appears to be an address.  Did

16   you, did you take a look at that address?

17   A    Two addresses.  The first one, the 313 New Bern --

18   Q    Well, let's not, let's not read into the record --

19         THE COURT:  It's legible. I can read it.  Just --

20         THE WITNESS:  Yes, sir.

21         THE COURT:  -- identify what it is.

22         THE WITNESS:  Yes.

23         The, the first, first address being Judge Bateman's

24   work address.

25   BY MR. KELLHOFER:

1  Q    Okay.  And what was the second?

2  A    His home address.

3  Q    All right.  And it appears there are numbers below that

4  that then, you know, state types of vehicles and color.

5       What, what are those numbers off to the left, some numbers

6  and, and letters?

7  A    License plates with make and model of cars.

8  Q    And were you able to determine where, what, what these

9  license plates associated to?

10 A    Employees of the law firm that Judge Bateman worked at

11 during --

12 Q    All right.

13 A    -- during this time.

14 Q    And then at the bottom was an Elizabeth Stephenson and, and

15 we've already established who you believe that to be --

16 A    Yes.

17 Q    -- the plaintiff's counsel with regard to that custody

18 battle?

19 A    Yes.

20 Q    All right.

21      All right.  Last few exhibits.

22      With regard to the IEDs that were recovered, were they

23 rendered safe?

24 A    Yes.

25 Q    All right.  And what is Government Exhibit 30?

1  A    A photograph of the IED that was placed on the porch, the

2  initial one, being removed by a robot.

3  Q    Okay.

4       And so if we look at Government Exhibit 31, those, those

5  wires right there, that, those are wires that went to that wire

6  that went underneath the house?

7  A    Yes.

8  Q    And then Government Exhibit 33 [sic], is that the same,

9  same item simply being taken apart?

10 A    Correct.

11 Q    All right.

12      And then in Government Exhibit 33, is that the, what, what

13 was contained within?

14 A    That was.

15 Q    All right.  And it was, in fact, the powder that you had

16 previously mentioned?

17 A    Yes.

18 Q    All right.

19      And then additionally with regard to what was contained

20 within the cylinder, the IED, what is Government Exhibit 34?

21 A    The improvised initiator, as I described earlier, the

22 lightbulb with the explosives inside.

23 Q    All right.  And is that the same type that the defendant

24 had additionally described and shown the source?

25 A    Yes.

1  Q   Now you'd mention that a search took place of both the

2  residence as well as the vehicles of, of the defendant,

3  correct?

4  A   Yes.

5  Q   Did that include the vehicle the defendant drove to the

6  State Fairgrounds where he was ultimately arrested?

7  A   Yes.

8  Q   All right.

9      And if we take a look at Government Exhibit 35, is that a

10 listing of the items seized from that vehicle?

11 A   Yes.

12 Q   And I'd like to turn to a few of particular interest.

13     What is Government Exhibit 36?

14 A   Another rifle.

15 Q   All right.  And what type of rifle is that?

16 A   One would consider a sniper rifle.

17 Q   All right.  And did that --

18 BY THE COURT:

19 Q   What's the caliber of that rifle?

20 A   I don't, I don't know off the top of my head.

21     In addition, too, I will add the, a ghillie suit,

22 camouflage.

23 Q   A what?

24 A   A ghillie suit.

25 BY MR. KELLHOFER:

1  Q   Which is, essentially, as you stated, a, a camouflage suit,

2  correct?

3  A   Correct.

4  Q   All right.  Those were in the vehicle, along with other

5  items, as, as noted in Government Exhibit 35, binoculars, ammo

6  There's also a, a Glock .23 pistol, magazine for that, etc.,

7  correct?

8  A   Yes.

9  Q   Okay.

10      Can you tell us what Government Exhibit 37 is?

11 A   Three North Carolina license plates recovered within his

12 vehicle.

13 Q   All right.  Based on your training and experience and

14 investigation of this case, is there any relevance to having

15 these three in his vehicle?

16 A   The defendant explains on his videos how to avoid or, or

17 escape capture from law enforcement or, and one of those steps

18 is utilizing someone else's license plates on his vehicle.

19 Q   All right.

20 BY THE COURT:

21 Q   What was the date of this?

22 A   I'm sorry?

23 Q   When was, when was this?

24 A   The arrest --

25          MR. KELLHOFER:  The date of the search?

1  BY THE COURT:

2  Q   When -- when were these -- when did, when did law

3  enforcement come into possession of these, of these license

4  plates?

5  A   That was January 22nd of 2022.

6  BY MR. KELLHOFER:

7  Q   Now you'd mentioned the --

8           MR. KELLHOFER:  The last exhibit I have, your Honor,

9  is with regard to the video that you'd previously spoken about,

10 sir.

11 BY MR. KELLHOFER:

12 Q   You had viewed those videos, is that correct?

13 A   Yes.

14 Q   All right.  Have you --

15          THE COURT:  This is 38?

16          MR. KELLHOFER:  Yes, your Honor.

17 BY MR. KELLHOFER:

18 Q   You had -- Government Exhibit 38 is a, is a video clip,

19 correct?

20 A   Yes.

21 Q   You, you reviewed it?

22 A   Yes.

23 Q   And can you just explain what it is?

24 A   It's titled The Siege and as you can see, the, the same

25 tapestry that was in the residence, the living room, is in the

1  background and he, Mr. Arthur, the defendant, is describing

2  what will occur after a SWAT hits your house.

3  Q   All right.  And how long is the entire, this particular

4  entire video?

5  A   I believe it's over eight minutes long.

6  Q   Okay.  And how, how long is this portion of the clip?

7  A   I think three of the eight.

8  Q   Okay.

9         MR. KELLHOFER:  So with your permission, your Honor,

10  I'll play the three-minute clip.

11         THE COURT:  Any objection?

12         MR. CHETSON:  No objection.

13    (Video clip played, as follows:)

14         "They have declared war on me and my family and my

15         community.  So there will be no more peaceful

16         negotiations.  They stopped the peaceful negotiations

17         when they tried to forcibly move themselves into my

18         home and assassinate me to take my guns.

19         Now having said that, so long as we have the ability

20         to peacefully and civilly combat that act, we should,

21         but when they try to kick in your door, there's no

22         more peaceful negotiations.  The time is over.  That's

23         the time for you to start putting land downrange.  Let

24         the siege happen.  At that point when they've backed

25         off and they're licking their wounds and so are y'all,

1          that's when you pick up that phone or that ham radio

2          or whatever form of communication you have, your

3          fellow militia members and you say, 'I need help.'

4          And that's when y'all fan a free cup, get out there

5          and put freaking boots in the ass.  Let them arrange

6          the bodies on the ground.  And you don't be chill

7          about it.  Now after you learn those things, it's

8          called infantry tactics.

9          Now who's your local militia?  Who should it be?  It

10         should be your neighbors.  It should be the very

11         people you see every day.  If you don't know who's

12         living in the houses to your left, right, front, and

13         rear and all that kind of stuff, shame on you.  Get

14         out of your house.  Go talk to them, really talk to

15         them.  I guarantee you'll find out two things.  One,

16         we're not that far off from each other.  Petty

17         differences aside, we're all the same sheet of music.

18         And two, they're every bit as scared and every bit as

19         worried about what's getting ready to happen as you

20         are and they're every bit as worried about an out-of-

21         control governmental officials trying to kick in their

22         front door.  Take charge of this.  Go out there and

23         organize your community, become a militia, a community

24         militia.  That's how you survive and end the, the

25         siege.

1          Remember, I am not teaching you something that is

2          kosher with current laws on the books.  This is

3          exactly how the military really fights.  This is

4          exactly the kind of stuff we do for defending our

5          positions and our perimeters.  I want you to take

6          this, put it in your head, enact it, and when the time

7          comes, kick ass."

8      (End of video clip)

9          MR. KELLHOFER:  Nothing further from the Government,

10  your Honor.

11          THE COURT:  All right.

12          Mr. Chetson?

13          MR. CHETSON:  Yes, your Honor, very briefly.

14                      CROSS-EXAMINATION

15  BY MR. CHETSON:

16  Q   Special Agent Garey, the incident with Mr. Blessed up in

17  New York, that occurred back in 2020, correct?

18  A   I believe so, yes, sir.

19  Q   Do you recall what month?  Would it have been about May of

20  2020?

21  A   I -- I -- I'll take your word for it.

22  Q   Okay.

23      And the Government's investigation into my client began in

24  earnest when?

25  A   I got -- me personally, I got involved, I believe, January

1   of 2022.  I don't know the exact date that the other agent that

2   investigated the case began his investigation.

3   Q    Well, the confidential human source appeared, began having

4   conversations with my client back in March of 2021, correct?

5   A    Correct.

6   Q    And then the video or audio that you've discussed here in

7   court that was recorded by the CHS was recorded on May 5, 2021,

8   correct?

9   A    Yes.

10  Q    Okay.  Just directing your attention to Government's

11  Exhibit 28, Page 30 of that, this is the order that was signed

12  by Judge Bateman?

13  A    Yes, sir.

14  Q    This warrant, rather, this warrant was signed back on July

15  28, 2021, correct?

16  A    Yes, sir.

17  Q    After my client was arrested, he was taken to the FBI Field

18  Office in Raleigh or Cary?

19  A    Yes.

20  Q    Okay.  And he was asked to record a, some instructions to

21  his wife, correct?

22  A    Correct.

23  Q    And he, in fact, complied with that and recorded some

24  instructions that were then relayed to his wife about

25  surrendering peacefully or --

1  A    Yes.

2  Q    Okay.

3       (Pause)

4            MR. CHETSON:  No further questions, your Honor.

5            THE COURT:  Any redirect?

6            MR. KELLHOFER:  No, thank you, your Honor.

7            THE COURT:  Thank you, sir.  You can step down.

8            THE WITNESS:  Thank you.

9            THE COURT:  Anything further from the Government?

10           MR. KELLHOFER:  Not evidence, your Honor.

11           THE COURT:  All right.

12           Mr. Chetson?

13           MR. CHETSON:  Your Honor, no third-party custodian,

14  your Honor, but I would, if I could approach with some

15  exhibits.

16           THE COURT:  Okay.

17           Have you seen these?  Has the Government seen these?

18           MR. KELLHOFER:  They've previously been provided, your

19  Honor.

20           THE COURT:  Okay.

21      (Defense Exhibits 1 through 8 provided to the Court)

22           MR. CHETSON:  And I'll be offering these by proffer,

23  your Honor.

24           THE COURT:  Okay.

25           Any objection to a proffer?

1          MR. KELLHOFER:  No objection.

2          THE COURT:  All right.  It's the --

3          Any, anything else?

4          MR. CHETSON:  No.  I just will, will address those in

5   argument.

6          THE COURT:  In your, in argument or do you --

7          MR. CHETSON:  I'll, I'll address them in argument,

8   your Honor

9          THE COURT:  Okay.

10         MR. CHETSON:  I mean, I'll -- they've been put in.

11         THE COURT:  Okay.

12         I'll hear first from the Government closing argument.

13         MR. KELLHOFER:  Thank you, your Honor.

14         It's the Government's belief there are no conditions

15  of release that would reasonably assure the appearance of

16  defendant as well as the safety of the persons, persons in our

17  community.

18         As far as the nature and circumstances, your Honor,

19  this is an individual, as, as has been presented through the

20  documents and the testimony, with an ideological view that his

21  rights are, are greater than those that are, in fact, provided

22  through our, our laws, your Honor.  In line with that, he's

23  created dangerous situations and has, through his own words, as

24  you heard here today, acknowledged that what he teaches and his

25  beliefs are not kosher under the current laws.

1   The -- the - the search that took place and the arrest

2   that took place were designed very specifically to force this

3   individual into a situation that did not involve violence

4   because everything this individual has propagated is violence.

5   An intent specifically, your Honor, with knowledge that ATF

6   agents may be entering a person's home, here's, essentially,

7   how to put them into a "fatal funnel."  Here's how to kill

8   them.  With regard to SWAT teams entering your home, your

9   Honor, here, here's how to handle that situation.

10   When he spoke with the CHS, he, he specifically

11   informed the CHS CHS had, basically, two options and that was

12   to, in essence, flee or fight and those are the very two

13   considerations that the Government is concerned about here,

14   that this individual will either flee or, in fact, fight if

15   given the opportunity.

16   Weight of the evidence is very strong, your Honor.  As

17   you heard, there, there is audio/video.  It's all recorded.

18   There's testimonial evidence.  There's documents, as, as you've

19   been provided some of them, and, and these are all with regard

20   to his provision and teaching of the explosives with the

21   knowledge and intent that these would ultimately be used to

22   harm and, in fact, kill law enforcement officers.

23   The history and characteristics of, of this

24   individual, he has family in the area.  He has, however, no

25   real employment or finances to speak of.  There is no drugs or

1  criminal mental history.  This is a little bit of an odd

2  situation, though, and the Government would argue that some of

3  these cut both ways.  This is an individual who, as you, you

4  clearly heard, propagates some things that are very good,

5  getting to know your community members, know who's around you.

6  Unfortunately, it's why he propagates that that is the problem.

7         So insofar as his history and characteristics go, it's

8  a bit of a mixed bag.

9         Finally, with regard to the nature and seriousness

10 here, your Honor, creating plans for, for, for enacting his,

11 his moral beliefs against, against actual existing laws is, is

12 highly concerning.  We've presented you with the way he had, he

13 had organized his home in line with his views.  The, the

14 paperwork that was, that was located, your Honor, is not

15 subject to the charge, which we, we fully acknowledge, but

16 highly disturbing and, and supportive of this individual's

17 beliefs as to his rights and what he believes he is rightfully

18 able to do regardless of, essentially, man's laws.  What other

19 weapons are hidden elsewhere, what other means exist, what

20 other bug-out bags, one can only theorize, but based off of his

21 teachings it is a good bet that they exist.  I would very much

22 not want to be a probation officer or an arresting agent in the

23 future with regard to this individual without the immense

24 efforts that took place by the FBI and the organization and

25 structuring of the arrest that took place.

1    The individual is a flight risk. He is -- is -- is

2    obviously prepared. He's got, as you, as you saw, his, his

3    vehicle is, is essentially ready to, to be a, a, a cache of

4    weapons as well as a, a means of covert escape through use of

5    multiple license plates. All in all, your Honor, the, the

6    evidence clearly displays --

7        THE COURT: I did notice those. They were all out of

8    date. I'm not sure -- they were out of date.

9        MR. KELLHOFER: Understood, your Honor.

10       The, the, the Government's position, your Honor, is

11   that the -- the -- there's a flight risk and certainly a safety

12   risk with regard to this individual that, that there simply are

13   not conditions of release that can assure this Court of another

14   result.

15       Thank you, your Honor.

16       THE COURT: Mr. Chetson.

17       MR. CHETSON: Yes, your Honor.

18       As the exhibits that have been proffered to the Court

19   indicate, my client has no real criminal history at all. I

20   think a speeding ticket and then there's a reference,

21   potentially a speeding warning in Texas in the discovery that's

22   been provided by the Government.

23       Graduation from Mount Olive College, his having

24   enlisted in the Army National Guard, in the Army itself, having

25   served as a scout, having done, I believe it is, two tours in

1    Iraq, along with a DD-214 that -- there are two of them here,

2    your Honor, Exhibit 4 and Exhibit 5 and 6.  5 and 6 are

3    duplicates of one another.  So you can just take 5, for

4    example, and a look at the commendations under Item No. 13

5    indicate his Campaign medal, two Campaign stars, Army

6    Commendation medal, Army Achievement medal, National Defense

7    Service medal, Global War on Terror, a Terrorism Service medal,

8    and so forth.

9         In addition to that, your Honor, there is, we've

10   included a Defendant's Exhibit 7, which is an NCO evaluation

11   report from 2015, which indicates his proficiency or success

12   having met various standards in the Army.  In addition, you can

13   read the comments which indicate he's a diligent, proficient,

14   and good leader in the Army.

15        Finally, Defendant's Exhibit 8, your Honor, indicates

16   the broad dates of service.  I will indicate, in addition to

17   that, that he served in the National Guard all the way up till

18   2019 when he decided not to further enlist.  Upon -- in

19   addition, I would ask you to consider and take under

20   consideration the probation report which recommends there is

21   some combination of conditions upon which he could be released.

22        I will let you know that he has a wife and three

23   children, two twins 3 years old, and another child, 5 years

24   old.  He cares for them deeply and wishes to return to them.

25        A day after being separated, being voluntarily, or

1  just deciding not to re-enlist in the Army National Guard my

2  client's father, who himself is a Marine veteran and a former

3  helicopter pilot trainer in the military, suffered a heart

4  attack.  He -- he -- he ran and operated a hog farm.  He

5  collapsed in the, in the actual pen with the hogs.

6  Fortunately, he was not injured, but my client from that point

7  forward took over the farm and that was, in part, how he was

8  making ends meet and supporting his family.

9          THE COURT:  That, that's his employment?

10         MR. CHETSON:  That's his employment, your Honor.

11 Further to that, he had previously served as a Duplin County

12 Sheriff in the early 2000s, also with Magnolia Police

13 Department, and, for a brief period, with the Kinston Police

14 Department as either deputy sheriffs or patrol officers.

15         So we have a, a man here who has served his country

16 honorably.  There's no indication in any of these reports about

17 -- all of the reports indicate Honorable Discharges or

18 honorable separations, having voluntarily left the police

19 departments in order to take other positions.  It's a man, he's

20 a man with, who has honorably served his country.

21         Obviously, some of the allegations are troubling and

22 some of what the Government found was troubling.  But

23 ultimately, he was arrested and conditions could be imposed,

24 the requirement, obviously, that he maintain any kind of

25 firearms and any sort of ammunition; the requirement that he be

1    electronically monitored; the requirement that, that he be

2    subject to searches; that he not be permitted to use or operate

3    the internet.  So there are conditions where he could be

4    released from custody, return to the community.  He does have

5    his mother and father who live right down the road.  The, the

6    evidence that the Government provided us, he talks extensively

7    about his, his kin and family owning the property that

8    surrounds this entire area in Duplin County.  These are, it's a

9    close-knit family.

10         And so we would ask you to release him on those

11   conditions.

12         THE COURT:  The issue this morning is whether there is

13   a condition or a combination of conditions that will reasonably

14   assure the appearance of Mr. Arthur at his future court dates

15   as well as the safety of any other person in the community.

16         The factors the Court considers include the nature and

17   circumstances of the offense charged.  They include whether the

18   offense is a crime of violence or involves a narcotic drug.

19         Secondly, the Court considers the weight of the

20   evidence against the defendant.

21         Thirdly, the Court considers the history and

22   characteristics of the person, including employment, family,

23   and community ties, financial resources, past conduct, history

24   relating to drug and alcohol abuse, the defendant's criminal

25   history, including convictions and prior arrests, the

1    defendant's record concerning appearances at court proceedings

2    in the past, whether at the time of the alleged offense the

3    defendant was on probation, parole, or some form of supervised

4    release.

5         The Court shall also consider the nature and the

6    circumstances of the danger to any person or to the community

7    that would be posed if the defendant were released. This

8    factor is given broad meaning in a way that isn't limited to

9    the potential for physical violence.

10         I gave this case a lot of, a lot of thought before we

11   even came into the courtroom this morning, given the nature of

12   the allegation against Mr. Arthur and the contents of the

13   Pretrial Services report recommending release in this case.

14   One of the things that's obvious from the report is, is that

15   Mr. Arthur satisfies a lot of these conditions. He's employed.

16   He has what appear to be strong, long-term family and community

17   ties in the area. I did not see any remarkable criminal

18   history of Mr. Arthur, saw no record of him even being on

19   probation, much less violating conditions of probation, parole,

20   or supervised release, a clear record concerning appearances at

21   court proceedings in the past. Certainly, at the time of the

22   alleged offense he wasn't on any form of supervision.

23         I don't know if I've ever seen a case like this. This

24   is, this is a case where overwhelmingly the evidence presented

25   and the Pretrial Services report as to the nature and

1   seriousness of the danger a defendant presents overwhelmingly

2   tips the scale in favor of, of detention.  Usually, the

3   observation from the bench is that if somebody's going to be

4   detained, the Court can point to how that person has done on

5   conditions in the past and the Court can rely on that as being

6   evidence that the person's not going to, there are no

7   conditions that can reasonably assure the Court that the

8   person's not going to pose a risk of flight or, or danger.

9           Here, there's, there's none of that in Mr. Arthur's

10  Pretrial Services report, but how do we know?  I mean, how am I

11  not, how am I not sure that he would not be a risk of

12  nonappearance or danger?  'Cause he's told us.  He's told us in

13  the video.  He's told us in what the Government has presented

14  as being their evidence in this case.

15          I, I find that Mr. Arthur is a danger.  I have no

16  confidence that if I release him back to his home that he's

17  going to follow conditions of release.  I have no confidence

18  that he's not going to cut off an ankle monitor and get into

19  one of the cars that he apparently has knowledge of or ability

20  to flee, or just not appear.  The level of enthusiasm he has

21  for this, the level of preparation that he has for being a risk

22  of nonappearance and danger is, is alarming to the Court based

23  on what the Government has presented in its, in its exhibits

24  and its testimony from the agent.

25          Now, Mr. Arthur, I've not, I've not found in your

1  favor this morning.  Understand, please, sir, that you have

2  every right to appeal my decision.  I will issue a written

3  decision this morning.  Mr. Chetson is a very good lawyer.

4  I've seen him practice effectively in other cases representing

5  clients effectively, in my view.  The reason I'm telling you

6  that is because if you wish to take an appeal of this order,

7  you certainly have the right to do so.  You can do that through

8  him.  I'll sign an order this morning and just know,

9  Mr. Arthur, that you'll have 14 days to take an appeal of that

10  order to the district court in this case.

11          Is there anything further regarding Mr. Arthur and

12  this case?

13          MR. CHETSON:  Not from the defendant.

14          MR. KELLHOFER:  Not from the Government, your Honor.

15          THE COURT:  All right.  Thank you very much.

16          COURT SECURITY OFFICER:  All rise.  This Honorable

17  Court is adjourned.

18      (Proceedings concluded at 11:30 a.m.)

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF TRANSCRIBER

 2           I, Janice Russell, court-approved transcriber, in and

 3   for the United States District Court for the Eastern District

 4   of North Carolina, do hereby certify that pursuant to Section

 5   753, Title 28, United States Code, that the foregoing is a true

 6   and correct transcript from the official electronic sound

 7   recording of the proceedings held in the above-entitled matter

 8   and that the transcript page format is in conformance with the

 9   regulations of the Judicial Conference of the United States.

10

11                    Dated this 28th day of March, 2022.

12

13

14                    /s/ JANICE RUSSELL
                      JANICE RUSSELL
15                    COURT-APPROVED TRANSCRIBER

16

17

18

19

20

21

22

23

24

25
```