UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
NO. 7:22-CR-00005-D

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | U.S. RESPONSE IN OPPOSITION |
| v. | ) | TO DEFENDANT'S MOTION |
| | ) | TO DISMISS COUNT ONE |
| CHRISTOPHER CLARK ARTHUR | ) | (D.E. 41) |

The United States, by and through the United States Attorney for the Eastern District of North Carolina, hereby responds in opposition to Defendant's Motion to Dismiss Count One, and states unto the Court:

### I. PROCEDURAL HISTORY AND STATEMENT OF FACTS

During the execution of a residential search warrant in in another state, improvised explosive devices (IEDs), firearms, tactical gear, and instructional manuals authored by Defendant, and which provided detailed instructions on how to make the IED's, were located. D.E. 18 at 5. Investigation revealed that the resident had been communicating via email with the Defendant at tackleberrysolutions.com. D.E. 18 at 7. It was also revealed the individual had attended training with the Defendant at the Defendant's residence in the Eastern District of North Carolina in 2020. D.E. 18 at 7.

The Federal Bureau of Investigation utilized a Confidential Human Source (CHS), to create a relationship with Defendant. D.E. 18 at 6. The CHS reached out to Defendant over Defendant's website and ordered some of the same manuals as had been recovered in the earlier out of state residential search. D.E. 18 at 8. The CHS then engaged Defendant in several e-mail and phone conversations, and ultimately

1

requested training from Defendant. D.E. 18 at 8 – 9. The CHS met with Defendant on May 5, 2021 for several hours at Defendant's residence. D.E. 41-2 at 1. Upon meeting with the Defendant, the CHS informed the Defendant that ATF agents had visited the CHS's property and "took inventory of most of [his] stuff." D.E. 41-2 at 6. The CHS told Defendant, "they're probably coming back." D.E. 41-2 at 6. Defendant responded he could "guaren-damn-tee" the ATF would return. D.E. 41-2 at 6. [sic]. The CHS then stated, "So, when they do, I want to be ready." D.E. 41-2 at 6. Defendant then discusses the measures he has in place, like not having the address on his driver's license reflect where he actually lives, the neighborhood watch they have, and an alert or alarm system that will bring neighboring family and friends for assistance if there is a problem. D.E. 41-2 at 6 -9. Defendant notes one would not need to move to a completely different area, just "so you're not exactly where you were last time." D.E. 41-2 at 9. The CHS simply responds "Not really in the cards right now;" Defendant responds "Yeah, that's fine, that's not the end of the world." D.E. 41-2 at 9. For the rest of the several hour meeting, and through 75 – 80 pages of transcript, the CHS and Defendant discussed different strategies for booby-trapping homes to defend them from a raid by law enforcement organizations. D.E. 41-2 10 - 88. After seeing a map of the CHS' property, Defendant paused. "I'm trying to think which one will be the better, a perimeter defense or a spiderweb defense. And, one is stupid lethal. Spider defense just absolutely ass rapes them. The problem with perimeter defense is you are going to have to rely on somebody else to pull your ass out of the fire . . ." D.E. 41-2 at 24. After conversation about dogs, electric fences and

other perimeter defense assistance, Defendant concludes, "You can kind of do a combination of the two and I that's the best way to go with this. [sic]. Delay, delay, delay on the outside. Inside, spider hole, spider, you know, spider defense." D.E. 41-2 at 29. Defendant offered suggestions of how the CHS might turn his property into a battleground, including placing an IED in the culvert near the property entrance (D.E. 41-2 at 30), or digging a large hole there sufficient to stop their vehicle, putting law enforcement in a "fatal funnel" (D.E. 41-2 at 31). "What these dumbasses are going to do, they're going to hunker down right behind that damn armored vehicle and the other guys are going to run. And that's when you start lobbing your grenades on them with your freaking shotty. . . " D.E. 41-2 at 31. Defendant suggests putting charges near the door wouldn't be a bad idea, that would "absolutely F them," like the one on his own front porch. D.E. 41-2 at 39. Defendant spends a significant amount of time, reflected in D.E. 41-2 45 – 58, on the spiderweb defense, giving the CHS a drawing of what it could be. D.E. 41-2 at 57. Defendant then shows the CHS how to make an initiator for an explosive from a filed light bulb and gun powder and gives the CHS the one he made as a demonstration. D.E. 41-2 at 58-60.

As a result of this interaction on May 5, 2021, Defendant was indicted for violating Title 18 U.S.C. § 842(p)(2)(B). It is alleged the materials and instructions provided to the CHS after the CHS asserted that the CHS wanted "to be ready" when ATF agents returned to his/her home violated this statute. Defendant seeks to have the Court dismiss this charge, contending 18 U.S.C. § 842(p)(2)(B) is: (1) impermissibly overbroad; (2) as the statute regulates speech it should be subject to,

3

and does not meet, strict scrutiny; and (3) it violates the *Brandenburg* requirement that restrictions on speech should be limited to the prevention of "imminent lawless action." Defendant misconstrues the facts and the application of the law, and his motion should be denied.

## II. ARGUMENT

"[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." As a result, the Constitution demands that content-based restrictions on speech be presumed invalid ... and that the Government bear the burden of showing their constitutionality." *United States v. Alvarez*, 567 U.S. 709, 716-17 (2012). Potentially relevant here, the Government is only permitted to restrict "advocacy intended, and likely, to incite imminent lawless action," "speech integral to criminal conduct," and "and speech presenting some grave and imminent threat the government has the power to prevent." *Alvarez*, 567 U.S. at 717.

On August 17, 1999, Congress enacted a new "teaching or demonstrating" provision within the criminal code section dealing with the importation, manufacture, distribution and storage of explosive material. Codified at 18 U.S.C. § 842(p)(2), this law made it unlawful for any person to:

> (A) *to teach* or demonstrate the making or use of an explosive, a destructive device, or a weapon of mass destruction, or to distribute by any means *information pertaining to*, in whole or in part, the manufacture or use of *an explosive, destructive device, or weapon of mass destruction*, **with the intent that the teaching**, demonstration, or information **be used for**, or in furtherance of, an activity that constitutes a Federal crime of violence; or

4

> (B) *to teach* or demonstrate to any person the making or use of an explosive, a destructive device, or a weapon of mass destruction, or to distribute to any person, by any means, *information pertaining to*, in whole or in part, *the manufacture or use of an explosive, destructive device, or weapon of mass destruction,* **knowing that such person intends to use the teaching,** *demonstration, or information for, or in furtherance of, an activity that constitutes a Federal crime of violence.*

18 U.S.C. § 842(p)(2), Pub.L. 106-54, § 2(a), Aug. 17, 1999, 113 Stat. 398 (emphasis added).

Title 18, United States Code, Section 842(p)(2) is substantially similar to a pre-existing offense found in the Civil Obedience Act of 1968, 18 U.S.C. § 231. Section 231 provides in relevant part:

> (a)**(1) W**hoever *teaches or demonstrates* to any other person the use, application, or *making of any firearm or explosive or incendiary device*, or technique capable of causing injury or death to persons, **knowing or having reason to know or intending** that the same will be **unlawfully employed for use** *in,* or in furtherance of, *a civil disorder* which may in any way or degree obstruct, delay, or adversely affect commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function

18 U.S.C. § 231(a)(1)(emphasis added). While the constitutionality of 18 U.S.C. 842 (p)(2)(B) has not been specifically addressed by the courts, both the strikingly similar 18 U.S.C. § 231 and the subsection preceding § 842(p)(2)(B) - subsection 842(p)(2)(A) - have been. The Government will draw from caselaw interpreting these similar statutes and others in its analysis.

5

In 1972, the Fifth Circuit Court of Appeals was faced with a challenge to 18 U.S.C. § 231. *U.S. v. Featherston*, 461 F.2d 1119 (1972). There, leaders of the Black Afro Militant Movement instructed others how to make and assemble explosive and incendiary devices. The purpose of the demonstration was to prepare for "the coming revolution." *Featherston*, 461 F.2d at 1121. Defendants argued the statute was vague and overbroad, requiring "men of common intelligence [to] guess at its meaning and application." *Id.* Itself using a Supreme Court case which had reviewed yet another analogous statute which used the language "with intent or reason to believe" (*Gorin v. United States*, 312 U.S. 19 (1940), interpreting the Espionage Act of 1917, 18 U.S.C. § 793), the Fifth Circuit noted bad faith is required by the terms of the statute, and found § 231 "sufficiently definite" to surpass constitutional muster.

The Fourth Circuit used *Featherston* in its analysis of whether civil liability might exist for the publishing of a book, <u>Hit Man: A Technical Manual for Independent Contractors</u>, which detailed graphically and in minute steps how to kill a person. *Rice v. Paladin Enterprises, Inc.* 128 F.3d 233 (4th Cir. 1997). When 3 persons were killed in the manner "taught" in the book by an individual hired to kill them, civil suit was filed by surviving relatives of those killed against the publisher of the book. *Rice*, 128 F.3d at 241. The publisher moved for summary judgment based on First Amendment grounds. *Id.* The publisher's conduct in *Rice*, stipulated to have been not only with the knowledge that readers would actually use the content

6

to commit murders, but intended to do so, was likened to criminal aiding and abetting.

Title 18, United States Code, Section 842 (p)(2)(A) was reviewed in *United States v. Coronado*, 461 F. Supp. 2d 1209, 1212 (S.D. Cal. 2006), as reported by Defendant. D.E. 41 at 5. In *Coronado*, the court held that, "the deterrent effect of § 842(p)(2)(A) on legitimate expression is insubstantial and remote. The statute affords people of ordinary intelligence the opportunity to understand what conduct is prohibited and does not foster arbitrary, discriminatory, or capricious enforcement. This is particularly true in light of the statute's intent requirement that such teaching or demonstration must be carried out with the intent to commit a federal crime of violence." *Id.* at 1216. The court concluded the statute withstood a facial vagueness challenge.

The instant case and challenged statute are like both *Featherston* and *Rice*. First, bad faith is required by § 842(p)(2)(B), and the facts meet the standard used by the Fifth Circuit. Second, literally like the publisher in *Rice*, Defendant knew others would use his instructions on how to build IEDs and, as demonstrated by his description of his avoidance of the prohibition now contained in N.C. Gen. Stat. Ch. 127A while trying to build a county militia-trained program (D.E. 41-2 at 5), it is reasonably asserted Defendant's whole purpose was to assist others in learning these techniques. He certainly demonstrated the intent to assist the CHS in his stated goal of killing federal law enforcement. D.E. While Defendant characterizes his teaching as "merely engag[ing] in abstract forms of advocating for self-defense" (D.E. 41 at 4),

7

how Defendant himself would react to a scenario or how a home could be defended hypothetically (D.E. 41 at 6), the record belies the assertion. The CHS expressed concern the ATF would be coming to his property and Defendant readily agreed they would indeed; the CHS gave Defendant an image of the CHS' property; and there was nothing abstract about instruction to place an IED in the culvert, electrified wire atop an existing fence, an IED by the door(s), or the way the "super lethal," "ass rap[ing]" spider web defense would work. See, D.E. 41-2 at 18, 24, 29, 30. Defendant did not respond in terms like, "if it was my place," or well, I guess one could . . . " Defendant did not speak in hypotheticals, he was speaking specifically and with the intent that the CHS follow his instructions to fortify the CHS' property with the goal of injuring or killing ATF agents whom the Defendant insisted would come back. The Defendant's speech intended to incite imminent lawless action by providing the CHS instructions on how to defend the CHS's property from an ATF raid by using deadly force and is therefore properly restricted by the 18 U.S.C. 842 (p)(2)(B).

Speech that incites imminent lawless action is not protected speech. Instructing an individual on how to defend their home from law enforcement entry by attacking the law enforcement agents by throwing grenades, planting IEDs, and digging punji traps with spikes (D.E. 41-2 at 12, 51), is speech that incites imminent lawless action and is not speech protected by the First Amendment. These things are not a lawful manner of self-defense.[1] The statute does not criminalize the distribution of

---

[1] Longstanding is the rule that you cannot defend your property solely from trespass (not admitting law enforcement properly on property is a trespass) with deadly force:

information as the Defendant suggests. The statute only criminalizes the distribution of information when the distribution of information is done with the knowledge that the recipient of such information intends to use it for a Federal Crime of violence. 18 U.S.C. § 842(p)(2)(B).

The Defendant argues that the statute criminalizes protected speech such as published books, articles or other internet materials. Since the teaching charged here was in person, However, the statute does not criminalize these items as there must also be the intent that the distribution be used in furtherance of a federal crime of

---

> If these boys, or young men, or whatever you may consider them, went down there and they were there unlawfully,-if they had no right to go there,-you naturally inquire whether the defendant was placed in such a situation as that he could kill for that reason. Of course, he could not. He could not kill them because they were upon his place.

*Beard v. United States*, 158 U.S. 550, 554, 15 S. Ct. 962, 963, 39 L. Ed. 1086 (1895).

*Beard* noted:

> In East's Pleas of the Crown, the author, considering what sort of an attack it was lawful and justifiable to resist, even by the death of the assailant, says: 'A man may repel force by force in defense of his person, habitation, or property against one who manifestly intends and endeavors, by violence or surprise, to commit a known felony, such as murder, rape, robbery, arson, burglary, and the like, upon either. In these cases he is not obliged to retreat, but may pursue his adversary until he has secured himself from all danger; and if he kill him in so doing it is called justifiable self-defense; as, on the other hand, the killing by such felon of any person so lawfully defending himself will be murder. But a bare fear of any of these offenses, however well grounded,- as that another lies in wait to take away the party's life, - unaccompanied with any overt act indicative of such an intention, will not warrant in killing that other by way of prevention.

*Beard v. United States*, 158 U.S. 550, 562, 15 S. Ct. 962, 966, 39 L. Ed. 1086 (1895). D.E. 44 at 10.

violence. It is not the distribution that is criminalized, it is the distribution plus knowledge that distribution was intended to be used for violence.

Finally, Defendant argues that since the CHS actually did not intend to kill federal agents, Defendant could not have violated the law which required knowledge of such intention. He supports this argument by citing *United States v. Rojas-Diaz* to establish that a person cannot conspire with a government agent. *United States v. Rojas-Dias*, 643 F. App'x 279, 283 (4th Cir. 2016). Defendant's argument misses the mark. It is irrelevant that the CHS did not intend to commit any acts of violence – rather, the focus is on what Defendant knew, or believed he knew. The situation is not analogous to the inability to conspire with a government agent.

Conspiracy is the very act of agreement with another person.[2] The person with whom one is agreeing therefore has to literally be able to form an agreement to commit the crime-something that a government agent or informant cannot do. Rather, "knowing that such person intends to use" the teaching (18 U.S.C. § 842(p)(2)(B)) is more akin to having direct knowledge of the person's state intention, or, as the *Featherston* court drew analogy to *Gorin* and § 793, above, the jury instruction on the analogous language in that section –"reason to believe." The jury in a § 793 case can be instructed thusly: "Reason to believe" means that the

---

[2] A "conspiracy" is an agreement between two or more persons to join together to accomplish some unlawful purpose. It is a kind of "partnership in crime" in which each member of the conspiracy becomes the agent of every other member.

Pattern Crim. Jury Instr. 5th Cir. 2.15A (2019), Pattern Crim. Jury Instr. 5th Cir. 2.15A (2019)

10

defendant knew facts from which he could conclude or reasonably should have concluded that the information could be used for the prohibited purposes." Eric Wm. Ruschky, Pattern Jury Instructions for Federal Criminal Cases, District of South Carolina § 793 (2019 Online Edition). In the case at bar, Defendant knew- he had been told and acted upon that information received-Defendant knew the teaching would be used to commit a federal crime of violence.

### III. CONCLUSION

Accordingly, for the reasons stated above, this Court should deny Defendant's motion to dismiss Count One. Title 18, U.S.C. § 842(p)(2)(B), does not violate the Constitution.

Respectfully submitted this 2nd day of September, 2022.

                                MICHAEL F. EASLEY, JR.
                                United States Attorney

BY:   /s/ Barbara D. Kocher
        BARBARA D. KOCHER
        Assistant U. S. Attorney
        150 Fayetteville St Suite 2100
        Raleigh, NC 27601-1461
        Telephone: (919) 856-4530
        Facsimile: (919) 856-4828
        Email:barb.kocher@usdoj.gov
        N.C. State Bar #16360

CERTIFICATE OF SERVICE

I hereby certify on September 2, 2022, I caused a copy of the foregoing to be filed within CM/ECF, which in turn will cause service upon counsel for defendant.

Edward D. Gray
Attorney for Defendant
Assistant Federal Public Defender
150 Fayetteville St Suite 450
Raleigh, NC 27601-1461


    /s/ Barbara D. Kocher_____
BARBARA D. KOCHER
Assistant United States Attorney

12

Case 7:22-cr-00005-D   Document 45   Filed 09/02/22   Page 12 of 12