UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

NO. 7:22-CR-00005-D

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CHRISTOPHER CLARK ARTHUR | SENTENCING MEMORANDUM<br>AND<br>RENEWED MOTION TO SET ASIDE<br>VERDICT UNDER F.R.C.P. RULE 29 |

The Defendant, Christopher Clark Arthur, by and through Counsel respectfully moves this Honorable Court for an order dismissing all counts of the indictment. Further, Defendant, by and through counsel, respectfully submits this sentencing memorandum in support of his request for a reasonable sentence. In consideration of, his military service and lack of criminal history, a sentence below the advisory Guideline range is sufficient but not greater than necessary to accomplish the sentencing goals of 18 U.S.C. § 3553(a).

**PROCEDURAL BACKGROUND**

Mr. Arthur was named in a nine-count Superseding Indictment filed on March 2, 2022, charging him with the making and use of an explosive, destructive device, and a weapon of mass destruction, knowing that such person intended to use the teaching, demonstration, and information for and in the furtherance of an activity that constituted a Federal crime of violence, to wit, the murder and attempted murder of federal law enforcement, in violation of Title 18, U.S.C. §§ 842(p)(2)(B) and 844.

1

Further, the government alleged in five of the separate counts that Mr. Arthur possessed a destructive device in the form of an improvised explosive device ("IED") in violation of Title 26, U.S.C. §§ 5841, 5845(f), 5861(d), and 5871. On July 12, 2023, Mr. Arthurs was found guilty of Counts 1 through 9 of the Superseding Indictment.

## FACTS

### A. *Offense Conduct*

In February 2019, Federal Bureau of Investigation (FBI) Richmond Division opened a full investigation of Joshua Blessed, formerly known as Sergeia Jourev, based on information that Blessed was organizing and attempting to recruit for a militia extremist group and preparing to engage in an apocalyptic battle against the U. S. Government. D.E. 18, Detention Hr'g. Tr. 3-5 and Presentence Investigation Report (PSR) at ¶ 6.

On May 27, 2020, Blessed was stopped by law enforcement in New York (NY) while he was driving an 18-Wheeler truck from Richmond to New York. Police attempted to pull Blessed over, as what appeared to be a routine traffic stop. *Id* at ¶ 7. Blessed was subsequently shot and killed following a two-hour police pursuit. During this pursuit Blessed fired on law enforcement personnel. *Id*. Livingston County Sheriff's Office, New York (LCSO) investigators noted Blessed had been communicating via email with an individual by the name of Arthur at tackleberrysolutions.com. PSR at ¶ 8. Blessed attended training with Tackleberry Solutions for multiple days at 410 Carter Thigpen Road, Mount Olive, North Carolinian late March of 2020. During a search of Blessed's residence in Richmond, Virginia, Agents located a tactical vest with

magazines, numerous fused pipe bombs (IEDs), and lighters, as well as three firearms in a closet of the room. *Id.* Also found during the search were multiple Tackleberry Solutions tactical instructional manuals, including a manual titled, "Quick Reaction Force-Modern Day Minutemen-Improvised Explosives," written by Mr. Arthur and certified by former U.S. Marine Corps Combat Engineer Chase Beatty. *Id* at 10. Additionally, the search revealed a U.S. Postal Service Priority Mail box/label showing correspondence from Tackleberry Solutions.

On May 5, 2021, FBI SAs Jarrett Doss and Craig Noyes met with a Confidential Human Source (CHS) (identified as S-82538), provided him/her with recording devices to consensually record Christopher 'Kit' Arthur and sent him to Mr. Arthur's residence to obtain this training. PSR at ¶ 12. *See also* DE-18, Detention Hr'g. Tr. 9. During this meeting for training, the CHS intimated that agents from the ATF came to his home and "took inventory" of a number of items. PSR at ¶¶ 11-14. During this meeting, Mr. Arthur discussed options that any person could take with regard to an unlawful entry of his home. Mr. Arthur discussed his experience in Iraq, and his views and theories with regard to his right to defend his home.

On January 22, 2022, agents from the FBI executed a search warrant on Mr. Arthur's residence. PSR at ¶ 17. Numerous items were located including: a Gem-Tech HALO firearm silencer, a Palmetto State Armory PA-15 rifle, and items identified as firearms within Counts Four through Eight. Numerous personal writings, journals and manuals were also seized. PSR at ¶ 18. At the time of the seizure, Mr. Arthur was not a felon nor was he otherwise prohibited from lawfully possessing firearms.

3

### B. Personal Background

Christopher Clark Arthur was born on August 9, 1983, in Fairfax County, Virginia into the family tradition of service to this nation. *See* Arthur Mitigation report attached to this Memorandum, Exhibit 1. He father was a member of the of the United States (U.S.) Marine Corps and his mother was an educator. PSR at ¶¶ 34-35. *See also* Character Letters attached o this Memorandum as Exhibit 2  He was raised in a God-fearing family built on the values of public service, hard work and self-determination. At the time of the offense conduct, Mr. Arthur was living on a parcel of the family farm in Sampson County, North Carolina.

Mr. Arthur graduated from North Duplin High School in May, 2001. He graduated with a Bachelor of Science degree from Mount Olive College in 2004. After graduating Mr. Arthur was drawn into a life of public service – and more importantly, serving others. Accordingly, Christopher Arthur started a career in law enforcement. His first position was as a Deputy for the Duplin County Sheriff's Office and later went to work for the Kinston Police Department. Ultimately, the calling of the family business, military service, won his heart. In 2006 Kit enlisted in the National Guard and completed basic training at Ft Knox, Kentucky. He was first stationed at Clinton, NC Armory; however, he eventually volunteered for Active Army assignment so he could be closer to operations. In 2007 he went active duty in the Army and was stationed at Fort Bliss in El Paso, Texas. It didn't take long for him to see a deployment. In 2007, he deployed to Iraq on his first tour in support of Operation Iraqi Freedom. In Iraq, he was stationed at Forward Operating Base (FOB) Sykes outside Tal Afar. This was a

4

base where the Army conducted offensive operations against insurgents and members of ISIS in northern Iraq. His duties were simple, he was an infantryman. This was not an easy deployment as mortar attacks and suicide bombings were the norm in that area of operations. Unfortunately, his unit sustained several casualties. This second deployment took place in November 2008. This deployment, he was stationed at FOB Hunter in Mozar province . This was also a deployment filled with mortar attacks, suicide bombings and, unfortunately, stress related suicides by US Army soldiers.

It was the deployments that changed Mr. Arthur. His family noticed a marked difference in him after that second tour. This was acknowledged by them as a turning point in his trajectory and the beginning of his descent into paranoid beliefs. *See* Hilkey Report, attached to this Memorandum as Exhibit 3. His military service has impacted Mr. Arthur immensely, he constantly reflects on his experiences, and acknowledges that those experiences played a role in his appearance before this court today.

## ARGUMENT

**A.** *Under a Counterman Analysis, the Conviction on Should be Set Aside.*

Mr. Arthur has been prosecuted for exercising his constitutionally protected right to free speech. The statute in question, Title 18 U.S.C. § 842(p)(2)(A), as applied, violates the First Amendment to the United States Constitution because it is: (1) impermissibly overbroad; (2) as it regulates speech, strict scrutiny should be applied; and (3) it violates

the requirement set forth in *Brandenburg v. Ohio*, 395 U.S. 444, 449 (1969) that restrictions on speech be limited to the prevention of "imminent lawless action."[1]

True threats of violence, everyone agrees, lie outside the bounds of the First Amendment's protection. *Counterman v. Colorado*, 600 U.S. 66, 72, 143 S. Ct. 2106, 2113, 216 L. Ed. 2d 775 (2023). The defense continues to argue that the Government must prove in true threats cases that the defendant had some understanding of his statements' threatening character. *Counterman,* 600 U.S. 66, 73, 143 S. Ct. 2106, 2113, 216 L. Ed. 2d 775 (2023). Mr. Arthur alleges that his statements were not true threats. In this case, the statements were not imminently threatening and were done in the context of self-defense training. It is true that the government can restrict statements "directed [at] producing imminent lawless action". *Brandenburg v. Ohio*, 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (*per curiam*). However, the statements and alleged threatening acts, in this case, were not imminent. The evidence in this case at best demonstrated a theme of concern and impact of possible distant future events in this country. As such, Defendant asserts that the writings and statements made by Mr. Arthur were not threats and did not constitute immediate harm to specified persons. *See Counterman,* 600 U.S. at. 73, 143 S. Ct. at 2114 (2023). The statements made by Mr. Arthur would be closer to making an "true threat" if Mr. Arthur had identified specific officers or identified a specific time and place in which to employ any of the discussed tactics; however, as it currently stands, the statements cannot be reasonably

---

[1] These arguments have been previously raised within DE-41.

identified as credible and imminent threats. As such, under Counterman, the conviction under Count 1 should not stand.

### B. *Under a Bruen Analysis, the Conviction on Should be Set Aside.*

Mr. Arthur has convicted by a jury with violating the National Firearms Registration and Transfer Records Act, by possessing non-registered firearms. Mr. Arthur continues to assert that under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen,* 597 U.S. 1, 20, (2022), that the conviction of Counts 2-9 are constitutionally erroneous.[2] Under *Bruen,* courts now have a simplified analysis to determine whether a statute impairs a person's Second Amendment rights. First, as a "threshold inquiry," the court must determine whether "the Second Amendment's plain text covers" the person challenging the law, the "arm" involved, and the person's "proposed course of conduct," Bruen, 597 U.S. at 17. If the Second Amendment's "bare text" covers the person, his arm, and his conduct, "the government must [then] demonstrate that the [challenged] regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 18, 44 n.11.

To meet its burden, the Government must "**i**dentify a well-established and representative historical analogue" to the challenged law. *Id.* at 30. The court must engage in a "historical inquiry." If the government cannot show there were sufficiently analogous regulations prevalent at that time, the law violates the Second Amendment. As the Second Amendment right to keep and bear arms is incorporated within the

---

[2] These arguments have been previously raised within DE-42.

concept of due process, The Supreme Court has held that it is a right that is deeply rooted in the Nation's history and traditions. *McDonald v. Chicago,* 561 U.S. 742, 767(2010). Further, as it is a fundamental right, the government bears the burden of showing the statute is constitutional. *Bruen*, 597 U.S at 24. "Only if" the Government proves that its "firearm regulation is consistent [in this sense] with th[e] Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* at 17 (citations omitted).

If the Second Amendment's "bare text" covers the person, his arm, and his conduct, "the government must [then] demonstrate that the [challenged] regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 18, 44 n.11. To meet its burden, the Government must "identify a well-established and representative historical analogue" to the challenged law. *Id.* at 30 (emphasis in original). As to courts, "th[e] historical inquiry that [we] must [now] conduct" requires "reasoning by analogy," in which the two "central considerations" will be whether "how" the proffered historical analogue burdened the Second Amendment right, and "why" it did so, are both sufficiently comparable to the challenged regulation. *Id.* at 28, 29. "Only if" the Government proves that its "firearm regulation is consistent [in this sense] with th[e] Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* at 17 (citations omitted).

Since filing the initial motion to dismiss (DE 42), other courts have ruled that similar firearms statutes were unconstitutional under the *Bruen* analysis. Section 18

8

USC 922(g)(1) has been determined to be unconstitutional by the Third and Ninth Circuit Courts of Appeal. *See Range v. Att'y Gen. United States of Am*., 69 F.4th 96, 106 (3d Cir. 2023)(Because the Government has not shown that our Republic has a longstanding history and tradition of depriving people like Range of their firearms, § 922(g)(1) cannot constitutionally strip him of his Second Amendment rights.) *U.S. v. Duarte,* No. 22-50048 (9th Circ. May 9, 2024)( Holding that § 922(g)(1) violates Duarte's Second Amendment rights and is unconstitutional as applied to him).  Section 18 USC 922(g)(8) has been held unconstitutional by the Fifth Circuit Court of Appeals.  922(g)(8) is the federal statute prohibiting possession of firearms by someone subject to domestic violence restraining order violates Second Amendment.  The court held that the statute was inconsistent with historical tradition. *U.S. v. Rahimi,* 61 F.4th 443 (5th Cir.), *cert. granted*, 143 S. Ct. 2688, 216 L. Ed. 2d 1255 (2023).  Further, within the Eastern District of North Carolina, Judge Flanagan has found 18 USC 922(g)(3), the statute prohibiting receipt of firearms by a person who was an unlawful user of a controlled substance, as applied to defendant, violated the Second Amendment. *United States v. Alston*, No. 5:23-CR-021-FL-1, 2023 WL 7003235 (E.D.N.C. Oct. 24, 2023).  These courts have found that parts of 18 USC 922 violate the Second Amendment, after determining that these statutes restricted the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense. S*ee Bruen*, 597 U.S. at 9.

      In this case, the government bears the burden to prove that as of 1791, there was a robust tradition of regulations that were "relevantly similar" to the National Firearms Registration and Transfer Records Act (NFRTA).  The NFRTA is a statute that restricts

9

Case 7:22-cr-00005-D   Document 106   Filed 05/17/24   Page 9 of 17

the ordinary, law-abiding citizen from possessing firearms, accordingly, the Bruen analysis applies. The government cannot show there were sufficiently analogous regulations prevalent at that time; accordingly, the law violates the Second Amendment, and Mr. Arthur's verdict must be set aside.

C. *The Guidelines require the "Threat" must be "Credible" Under Counterman.*

Defendant objects to the offense level of 33 under USSG §§2A2.1(a)(1) and the cross reference at §2K2.3(c)(1)(A) for use or possession of any explosive material in connection with the commission or attempted commission of another offense; or possession or transfer of any explosive material with knowledge or intent that it would be used or possessed in connection with another offense. As Mr. Arthur did not fire upon, brandish, engage, or otherwise use a firearm against any law enforcement, the basis of the Attempted Murder cross-reference under USSG §2A2.1(a)(1) (and associated base offense level of 33) is based solely on the writings and statements of Mr. Arthur. Under Counterman, the communication must qualify as what the Supreme Court has called a "true threat" in the First Amendment context. *Counterman* 600 U.S. at 74 (2023). The guideline thus excludes "hyperbole," sarcasm, or similar statements that, when read in context, could not be reasonably read as communicating a realistic "possibility that violence will follow[.]" *Id.* Mr. Arthur contends that the statements, taken as a whole does not communicate a possibility that violence will follow. As such, the application of the attempted murder cross reference under USSG §2A2.1(a)(1) is inappropriate. The statements made by Mr. Arthur do not support a finding that

10

"violence will follow" and more specifically that he attempted to commit murder or took steps tantamount to attempting murder.

Further, the firearms were not used in the course of any felony activity. Mr. Arthur was not aware of the actions of Mr. Blessed as he was engaged in a shoot out with law enforcement as part of an impromptu traffic stop. The confidential informant did not use any firearms provided by Arthur in any felony activity. All of the items found on the property of Mr. Arthur were possessed for the sole purpose of self-defense and were not used against any person. Accordingly, the only basis for the application of the cross-reference is the protected speech.

### D. *These Acts are not Intended to Promote Terrorism*

Defendant objects to the 12-level increase under USSG §3A1.4(a) for Victim Related Adjustment based upon the assertion that the defendant engaged in terrorism or intended to promote terrorism. The actions of the defendant do not rise to meet the elements of 18 U.S.C. § 2332b(g)(5). 18 U.S.C. § 2332b(g)(5) reads, in part:

> (5) the term "Federal crime of terrorism" means an offense that--
> (A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and
> (B) is a violation of--
> (i) section […] 1114 (relating to killing or attempted killing of officers and employees of the United States),

In this case, the actions of Mr. Arthur were not to influence or affect the conduct of government. There is not intent to intimidate or coerce federal agents, under a reading

11

of the evidence in a light most favorable to the government; it is to run from or defend from agents:

> CS: I didn't know that I could ask over the phone. Um, so, ATF's been to my
> house. They took inventory of most of my stuff."
> ARTHUR: "You let them do that?"
> CS: "I wasn't home."
> ARTHUR: "Woah, woah, woah, wait."
> CS: "My wife let them in the house."
> ARTHUR: "I was about to say, how the hell they get in your house."
> CS: "Um, they're probably coming back."
> ARTHUR: "You can guaren-damn-tee that."
> CS: "So, when they do, I want to be ready."
> ARTHUR: "So, you've got two choices. Stand and fight or be ah not exactly where you're supposed to be."

PSR at ¶¶ 14.

As no agents were harmed nor were any agents at risk of immediate harm, and thete was no purpose to promote terrorism the application of this enhancement is not warranted. *Cf United States v. Kobito*, 994 F.3d 696, 703 (4th Cir. 2021). Accordingly, Mr. Arthur argues that the 12-level increase under USSG §3A1.4(a) should not apply.

### E. *The Application of USSG §3B1.3 is Inappropriate in this Case*

Defendant objects to the application of a 2-level increase for Role in the Offense: abuse of a position of public or private trust, or use of a special skill, in a manner that significantly facilitated the commission of the offense under USSG §3B1.3. Mr. Arthur was a civilian at the time of the offense conduct. He was not serving any public office or position. He was not acting on behalf of any public entity nor utilizing any public position to further the acts within this offense. The application notes for USSG 3B1.3 define Public or Private Trust as:

12

> "Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature. **For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult)**. This adjustment, for example, applies in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination. This adjustment does not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors. (Emphasis added).
>
> Application Note 1, USSG 3B1.3

Mr. Arthur's conduct does not fall within this definition. Further, at no time did Mr. Arthur provide any indicia to the confidential informant that he legitimately held a position of public or private trust. Finally, Mr. Arthur's training and abilities does not fall under the definition of special skill as he has no qualifications as a demolition expert. *See* Application Note4, USSG 3B1.3. He is clearly a firearms enthusiast who has had training on first aid, and employment of firearms; however, this skill does not rise to the level of a special skill. His skill was clearly attainable by viewing internet videos, as demonstrated through the evidence.

As identified within the PSR, Mr. Arthur's military background does not contribute any special skills to his abilities. He was an infantryman and a driver in the U.S. Army. If he had been trained as a demolition expert or as a combat engineer, then

he would have to concede he possessed a special skill. Inasmuch as we have in this case, Mr. Arthur is simply employing information attainable by any layman. As Mr. Arthur did not hold any position of trust nor use a special skill, application of this enhancement is appropriate.

### F. *Mr. Arthur's Military Service and Good Works Support a Downward Departure or Variance.*

After considering the § 3553(a) factors, the court must make an "individualized assessment" to craft a sentence that is "sufficient, but not greater than necessary." *Gall v. United States*, 552 U.S. 38, 50 (2007); 18 U.S.C. § 3553(a). Applying the § 3553(a) factors to this case reveals that a sentence below the Guideline range is sufficient but not greater than necessary to accomplish the goals of sentencing. Accordingly, we respectfully request that this Court impose a sentence below the recommended Guideline range.

Section 5H1.11 of the Guidelines provides that "[m]ilitary service may be relevant in determining whether a departure is warranted, if the military service, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines." U.S.S.G. § 5H1.11. Mr. Arthur's honorable military service distinguishes his case from typical cases and warrant a downward departure or variance.

Mr. Arthur served in the US Army with distinction. He earned the Iraq Campaign Medal with two campaign stars, the Army Commendation Medal, the Army

14

Achievement Medal, the National Defense Service Medal, the Global War on Terrorism Service Medal, the Iraq Campaign Medal with campaign star (second award), the Non-Commissioned Officer Professional Development Ribbon, the Army Service Ribbon, and the Overseas Service Ribbon. PSR ¶ 44.Mr. Arthur and separated honorably at the rank of Specialist (E-4). *Id*. During his term of service, he did not receive any non-judicial punishment, letters of reprimand or any other administrative discipline. He joined the Army with a desire to service his country and serve others.

Mr. Arthur has a need for medical and mental health treatment as a direct result of his military service, accordingly, this supports a downward variance. *See* Exhibit 3. *See also* 18 U.S.C. § 3553(a)(2)(D) (court must consider the need for the sentence imposed to provide the defendant with needed treatment). PSR ¶ 37. He has a hernia and hearing loss that require ongoing care. These are service-connected injuries and is not connected to the allegations which are the subject of his sentencing. *Id.* As such, there is no dispute that Mr. Arthur's service did result in long standing injuries for which he is appropriately being compensated. Accordingly, he is in need of medical support to address his injuries and the related issues associated with the injuries. Without such therapy, Mr. Arthur is unfortunately likely to impact him for years to come.

## CONCLUSION

Accordingly, for the reasons set forth above, Mr. Arthur respectfully requests that this Court set aside the verdict against him. Should the court deny reconsideration of the motion to set aside the verdict of the jury, Christopher "Kit" Arthurs is asking

15

this Court for a below-Guidelines sentence to allow him the opportunity to prove to the court and those around him that he is more than the aberrant behavior that he has pled guilty to. Given the individualized circumstances of this case, a downward departure or variance is necessary to achieve a sentence that is "sufficient but not greater than necessary." Accordingly, Mr. Arthur asks this Honorable Court to impose a sentence below the recommended Guideline range.

Respectfully submitted this 17th day of May 2024.

G. ALAN DUBOIS
Federal Public Defender

/s/ Edward D. Gray
EDWARD D. GRAY
Assistant Federal Public Defender
Attorney for Defendant
Office of the Federal Public Defender
150 Fayetteville Street, Suite 450
Raleigh, North Carolina 27601
Telephone: 919-856-4236
Fax: 919-856-4477
E-mail: Edward_Gray@fd.org
N.C. State Bar No. 37539
LR 57.1 Counsel Appointed

## *CERTIFICATE OF SERVICE*

   I HEREBY CERTIFY that a copy of the foregoing was served upon:

Barbara D. Kocher
United States Attorney's Office - EDNC
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601
919-856-4530
Fax: 856-4487
Email: barb.kocher@usdoj.gov

by electronically filing the foregoing with the Clerk of Court on May 17, 2024, using the CM/ECF system which will send notification of such filing to the above.

   This the 17th day of May 2024.

              /s/ Edward D. Gray
              EDWARD D. GRAY
              Assistant Federal Public Defender
              Attorney for Defendant
              Office of the Federal Public Defender
              150 Fayetteville Street, Suite 450
              Raleigh, North Carolina 27601
              Telephone: 919-856-4236
              Fax: 919-856-4477
              E-mail: Edward_Gray@fd.org
              N.C. State Bar No. 37539
              LR 57.1 Counsel Appointed