UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
NO. 7:22-CR-00005-D

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | U.S. RESPONSE IN OPPOSITION |
| v. | ) | TO DEFENDANT'S SENTENCING |
| | ) | MEMO AND MOTION TO SET |
| CHRISTOPHER CLARK ARTHUR | ) | ASIDE VERDICT (D.E. 106) |

A jury found CHRISTOPHER ARTHUR guilty on July 12, 2023, of all nine counts charged in a superseding indictment. Amongst the crimes for which the jury found the defendant guilty was distributing information relating to explosives, destructive devices, and weapons of mass destruction in furtherance of a federal crime of violence, specifically murder or attempted murder of a federal law enforcement officer in violation of 18 U.S.C. § 1114, all in violation of Title 18, U.S.C. §§ 842(p)(2)(B) and 844. ARTHUR has filed a sentencing memorandum seeking vacatur of his conviction(s) and articulating objections to the guidelines range calculated within the Presentence Report; the government stands in opposition.

## I.     FACTUAL SUMMARY:

JOSHUA BLESSED was stopped by law enforcement in New York (NY) and was subsequently shot and killed following a two-hour police pursuit, with BLESSED firing on law enforcement.    Searches were executed on BLESSED's car and BLESSED's residence in Virginia. During the searches, agents located numerous improvised explosive devices (IEDs). Pertinent to the instant case, also found during the search were multiple Tackleberry Solutions tactical instructional manuals,

including a manual titled, "Quick Reaction Force-Modern Day Minutemen-Improvised Explosives", written by the defendant and "certified" by a former U.S. Marine Corps Combat Engineer. Additionally, the search revealed a U.S. Postal Service Priority Mailbox/label showing correspondence from Tackleberry Solutions, 410 Carter Thigpen Road, Mount Olive, NC 28365 to BLESSED. 14 live pipe bombs found appeared to be identical to the ones found in the Tackleberry Solutions manuals. D.E. 30 at 5-6; Trial Ex 1, 1a – 1f.

Email communications with "Arthur" included conversations about the merits of different styles of claymore mines. Additionally, BLESSED attended training with Tackleberry Solutions for multiple days during March 21 through March 28, 2020, at 410 Carter Thigpen Road, Mount Olive, NC.[1]

On or about March 19, 2021, a CHS requested a free PDF document through a link from the Tackleberry Solutions YouTube channel. The link was posted in the video named, "How to Repel a Trained Militarist Force." After a short period of time, the CHS received an email from the defendant utilizing email account prepare@tackleberrysolutions.com. In part, the defendant stated, "To prevent being flagged or shut down, I've had to keep parts of this information off the internet. Especially since explosives are such a touchy topic. There is no digital copy of some of the things I want to share with you." Trial Ex. 2 – 2c2.2, 43.

Beginning March 25, 2021, an FBI CHS was able to make numerous recorded

---

[1] Provided to defendant as Gov Ex 33 for Trial, but not used in evidence.

2

calls with the defendant.  Of note[2]:

- CHS: "I got the free the free PDF one uh… through the email uh earlier this week and I've been looking through it and I like it, but uhm…I'm kinda interested in the… I think it was…the militaristic force one the how to—"

- ARTHUR: "Yeah how to repel a militaristic force. Yeah well…**with what they're talking about in the Biden administration that might be important hadn't it**."

- CHS: "Well… I'll get to that. Yeah…so, uh I'm-I'm kind of uhm…into the improvised explosives one too."

- ARTHUR: "Yeah, no they-they definitely go hand in hand. Uh, so what the militaristic force does-- I have a QRF series and it's literally designed to help you build your own quick reaction force the…for your neighborhood. Anything that happens you know guys have [UI] and you'll see that when you get the uh… [UI] militaristic [UI] force you'll see that I talk about you're going to need a QRF or you're gonna need a really freaking great bug out plan. I mean it's one or the other. Uh… you got only three options: surrender, fight, or flee that's pretty much all you got. Yeah so…"

- CHS: "Uh the-the-the the nice part is uh I've already had some knocks at the door and… so… I mean----that, but-- Uhm I just you know… them coming back is what worries. They say they're not coming back, but I just… I don't know man."

- ARTHUR: "all I can say is keep in mind they're the poor dumb bastards that's----being told to do that. At the same time, and I had an argument with one of em last night is a buddy of mine that I help get through BLET. Love the guy to death, I mean I helped get him through it. I-I helped get him through SWAT training and everything and I'm like well you don't understand here. Sss…[PH] you're the freaking rubber meeting the road at what point are you gonna you know. Which you gonna behold to your oath…freaking guys that are sending out the warrants. You know this is wrong."

Ultimately, the CHS purchased two Tackleberry Solutions manuals for $875 -

Wartime Tactics: How to Repel a Trained Militaristic Force and Book 3 of 5, Quick

Reaction Force, Modern Day Minutemen, Improvised Explosives. The manual

---

[2] All recorded calls, transcripts, and texts provided to defendant in discovery at 1664-1725.

contains a section explaining when someone may be justified in using the militaristic and violent tactics. In pertinent part, it lays out:

*Wartime Tactics* QRF Improvised Explosives - Justice  Tackleberry Solutions

## QRF
### When are you justified to declare war and use these tactics?

You have a God given right to life, liberty, and the pursuit of happiness. Should anyone, regardless of their job title or status, interfere in yours or anyone's else's ability to self-govern and have life and liberty, - it is not just your right, but your *duty* to act. Obviously, you must use every legal means possible before resorting to other methods. But when all else fails, it is your duty to defend freedom with war against oppression.

Just read the Decoration of Independence or the Constitution. Our founding fathers wished to ensure that "WE THE PEOPLE" controlled everything within our own lives. They feared governments and power held by the few. They knew that this would lead to a slavery of some form.

So in the defense of yourself and/or your neighbor, you are obligated to act. That's right, because you now have this knowledge, God expects you to use it to end slavery, of every kind. To protect those that don't have this power or knowledge.

It continues:

So should you find yourself fighting a tyrannical local government, don't stop at the first battle with the "enforcers." You must continue, take the fight straight to enemy. Storm the capital, court houses, or other local government buildings till you can round up all those responsible. Remember, tyranny is oppression of a few upon the many. If those running the government realize they are not safe and will be held accountable for their actions, they will be less willing to act outside the wishes of those they govern. Do not destroy the governmental system that is in place, we must uphold the system designed by our founding fathers. Instead, we place appointed representatives in place until such time as a special election can be held.

Further on in the manual, the defendant points to Missouri as a positive example that has "now re-declared their sovereignty by standing up their militia and declaring the [National Firearms Act] of 1934 as unconstitutional." He then moves on to talk about God-Given rights and implores readers that "when there are no other legal options to defend those rights, that God will back you when you defend those rights

4

with war." In fighting for those rights, the defendant says "Don't' half ass this, go all out. Just think of the number of times that we have seen in history that not killing all the enemy of when they had the chance led to more war later." Trial Ex. 2a and 2b.

In addition to the manuals, the defendant included a thumb drive containing 18 instructional videos focused on How to Repel a Militaristic Force. Included amongst those were videos entitled "Fortify your Position," "Repel the Assault," "Rally Your Community," "Fight Back," and "Explosives." The "Explosives" video depicts the defendant providing instruction and proper placement of IEDs. The entire series aims to explain how to stop a militaristic force like a SWAT team and get that force to back off. In discussing these tactics, the defendant looks to Ruby Ridge, Waco, and the Bundys as inspiration. Trial Ex. 2c.1 and 2c.2.

In a bonus video entitled "Fortification – Advanced," the defendant explains steps to make it harder for Law Enforcement to Assault a home. During the video he says: "most SWAT teams are sissified because they've gotten so use to having easy assault targets. Honestly, SWAT Teams haven't really had a solid fight. Every time in the history's past, when they have had a solid fight, they've ended up immediately backing off. Look at Waco, Texas" and then went on a recap the incident involving the Branch Davidians and ATF. Approvingly, he says "they effectively repealed the assault. They killed four people and wounded several, which is some we are going to talk about when we get into the firefight. You actual want to cause wounds, injury more than you want to cause immediate death." Later in that video, the defendant

5

explains that by fortifying a door with long screws and a striker plate, you give yourself time to be prepared for the SWAT team. the defendant explains you will be ready and waiting to "F*** them up....This is your time to engage them. Through the door, through the wall, whatever....Start lighting them up." the defendant finishes this video by discussing shortcomings in SWAT tactics that can be exploited to cause more casualties and fatalities. Throughout the videos, the defendant returns to the confrontation in Waco, in addition to the events at Ruby Ridge, as examples of what his viewers should and should not do. Trial Ex. 2c.1 and 2c.2.

Additionally, the defendant maintained an active YouTube Channel where he posted hundreds of militaristic videos.[3] Amongst the videos is a three-part series from October 22, 2019, entitled "How To Overthrow a Tyrannical Government – Why Guerilla Warfare Won't Work in America." During Part 1, the defendant claims that guerilla warfare won't work today because "Government agencies have plenty of practice against this type of fighting." The end of Part 1 advertises Part 2 of the series as "The New Form of Guerrilla Warfare in America." In Part 2 the defendant starts by saying "let me tell you what is actually going to win this newest war coming here in the states, for any of you that has any intelligence you can see where this is going, we are definitely going to be fighting a deep state." He explained that "the politicians are really the ones we have given the power to run this country, furthermore these are guys that are writing things like the red flag law into play, they are the ones

---

[3] Provided to Defendant May 20, 2024.

Case 7:22-cr-00005-D   Document 107   Filed 05/20/24   Page 6 of 25

violating the constitution."[4] On the screen, this appears:



"If we are able to overthrow [the politicians] and place new guys in power," the defendant continues, "that are going to decide and govern under the constitution, we will effectively take our country back." The defendant advocates for using force to appoint a new government that can investigate alleged abuses by a previous regime. As he explains his scheme, this appears:



---

[4] In the fall of 2019, news stories reported that Senators Lindsey Graham and Richard Blumenthal were working to craft a bi-partisan law to encourage states to adopt red flag laws that would permit the issuance of Extreme Risk Protection Orders permitting the temporary removal of firearms and ammunition from potentially dangerous individuals. On the state level, Colorado, Hawaii, Nevada, New York, and Virginia all adopted red flag laws. At the same time, similar legislators in Arizona, North Carolina, Tennessee, and Nebraska all proposed red flag laws.

These newly appointed judges will be responsible for "finding these people guilty and hanging them and holding them accountable for their crimes and actions against the constitution, it is solely going to be your job as a soldier to arrange that meeting." As the defendant explains all this, the video has this image:



Part 3 of the series – which has now been made private – sets out a plan to overthrow a government by starting at the local level with a militia. He explained that "if you do not have a city council, mayor, and police chief that is willing to work with you and willing to support and help you build a militia, then you know they are the enemy" and that "you immediately take them out" as this shows on the video.



The defendant directed viewers that "whatever you do it has to be very violent and

very ugly. We have to send a clear message that we will not tolerate spying, espionage, or treason." Once local government was addressed, the defendant advocated moving onto the state and then national level. In the scenario he foresaw, the defendant stated, "and now the National Guard has been called in, to stop this, because the deep state doesn't want this to happen" and that fighting the National Guard head on would not work. Instead, he proposed abducting the Governor and commanding officer to get the Federal Government to stop. He concludes by saying:

> [t]hat is the new form or Guerilla Warfare. That is the new way of fighting this war that is coming to the United States. Take the bad guy out through a snatch and grab. Hold him accountable. Have him publicly tried and then have him executed. That is the way we must do this.

Gun confiscation, red flag laws, Ruby Ridge, and Waco were recurring themes for the defendant. The defendant wrote a blog post on Ruby Ridge. Amongst its text:

### The Red Flag Law

The Red Flag Law is the "legal" starting point that law enforcement is using as a reason to take your guns without due process. More and more people have had this happen to them without any say. And once you've been put on that list - good luck getting taken off of it and getting your guns back. The only thing you have to do in order to re-enact the tragedy of Ruby Ridge is to resist these unconstitutional gun confiscations.

https://tackleberrysolutions.com/ruby-ridge/ (last accessed May 20, 2024). In a YouTube Video embedded in the post, entitled "Ruby Ridge – How to Prevent or Stop Unconstitutional Home Invasions," the defendant promises that "every, law-abiding gun owner is subject to the exact, very similar siege that happened to the Weavers. The Weavers were targeted by the Federal government for a barrage of reasons…."

9

After describing the first engagement in Ruby Ridge between the US Marshals and Sammy Waver, the defendant suggests that people in similar situations should use the confusion caused by exchange of gun fire as an opportunity to close and engage with law enforcement to allow his family to escape. He elaborated that "guys, this is how this goes down. You go out. You engage them. Use suppressive fire. One Round One Second. Whatever it takes." The result of such engagement should give individuals breathing room, according to the defendant, and avoid law enforcement back up "so when the cavalry arrives, they (law enforcement) get there, and there's nothing, if they find anything it's a bunch of dead cops and that's it." At the end of the video, the defendant asks:

> So how does this directly affect you? Well because it starts with little crap like the red flag law. Look at Ohio, they just passed the red flag law, and for those of you that don't know what that is, the red flag law states that if for any reason a certain criteria is met that any and all law enforcement agencies should and will and can seize any and all weapons from any individual that meets that criteria without due process….
>
> And if you resist, they're going to do the same thing to you that they did to the Weavers, and to Waco, Texas, to the Branch Davidians. So, you think for a second that you can't possibly be involved in a situation like Ruby Ridge, think again.

ARTHUR also posted a video that explored Waco, Texas and law enforcement's encounter with the Branch Davidians. the defendant commends the Branch Davidians for a "solid freakin' stand" and then lays out lessons learned. At one point he highlights the use of a fatal funnel and elaborates that

10

basically what you're doing is putting these [Federal Law Enforcement] in a sitting coffin and like I said, they got two choices, get slaughtered or comply. And should they comply, you just effectively taken hostage and entire raid team and completely put these guys now back on the defensive, you've effectively changed the dynamics of the battlefield and put them on the defensive instead of the offensive.

Later in the same video, the defendant criticizes law enforcement and the federal government by saying it was willing to use the military and violated the Constitution in order to arrest the Branch Davidians. At the end of the video, the defendant tells viewers to get to know their local sheriffs and law enforcement because they "are your second to last line of defense to our constitutional rights."

On May 5, 2021, as the Court heard during the trial, the CHS participated in training conducted by the defendant at ARTHUR's residence here in the Eastern District of North Carolina. Trial Ex. 51 through 51.6T. The conversation included, but was not limited to the following:

CHS: "I didn't know that I could ask over the phone. Um, so, ATF's been to my house. They took inventory of most of my stuff"

ARTHUR: "You let them do that?"

CHS: "I wasn't home"

ARTHUR: "Woah, woah, woah, wait."

CHS: "My wife let them in the house."

ARTHUR: "I was about to say, how the hell they get in your house."

CHS: "Um, they're probably coming back."

ARTHUR: "You can guaren-damn-tee that."

11

CHS: "So, when they do, I want to be ready."

ARTHUR: "So, you've got two choices. Stand and fight or be ah not exactly where you're supposed to be."

After the CHS informed the defendant that moving was not an option, the following

exchange occurred:

KA: We can go lethal or non-lethal and that depends on you. There's so many different things you can do that it's it's the sky's the limit. The biggest thing I'm trying to get you guys to do is with those books is to start to think.

CHS: Mmhmm.

KA: Think outside the box. So that you can take your environment and just develop the battlefield out of it.

CHS: Yeah.

KA: And that's what we're, I'm going to help you do today.

CHS: Ok.

KA: So ask me all the questions you have about stupid nitpicking stuff and then we're going to walk into, I'm going to show you something called the Spiderweb. This was something I built for a fellow recon buddy of mine that I was in Iraq with my hitch, both hitches when I was in Iraq [UI]. Dorph [ph] bought a house still under construction in a suburb and he was at the front of the cul-de-sac. But he realized it was a bad spot and he was out in the country and he wanted something set up. So I gave him a set up and he didn't want, he wanted to work alone, he did not want to work with his neighbors. So for whatever reason. So I gave him a set up called the Spiderweb and it is a freaking death box. And he has no kids, no wife, and he can do every bit of this by himself.

During the rest of their conversation, which lasted approximately three hours

and fifteen minutes, ARTHUR described "the Spiderweb" as "stupid lethal. Spider

defense just absolutely ass rapes them." The defendant explained how to implement

this Spider Defense by properly placing IEDs throughout CHS' property, the

importance of creating a fatal funnel, the setup and use of remote activated firearms, and how to evade arrest after killing members of law enforcement. At the conclusion of their meeting, the defendant gave CHS several components to construct an IED. The defendant gave CHS a tripwire switch for an IED; sections of time fuse; and a bag with light bulbs to be used to detonate an IED, one of which the defendant filed the tip off in CHS' presence and described how the bulb should be filled with gun powder and sealed off with silicone. The defendant gave CHS a hand drawn blueprint of a residence which showed the defendant's "Spiderweb" technique which is used to defend a residence through various methods to include the use of IEDs. The defendant discussed having trained other people with one specifically described training fitting that of JOSHUA BLESSED.

### 3. Search of ARTHUR's Residence

Following indictment of the defendant, careful entry into and search of the defendant's home in Duplin County, NC was undertaken. Numerous weapons and ammunition were found, most of which were discussed during the trial. Additionally, and relevant to this memorandum, papers were recovered. First, a document entitled America God's Land of Liberty was recovered.[5] The title page and table of contents give a fair representation of the contents of that writing:

---

[5] This document was produced to defendant in discovery and provided with trial exhibits, marked as Gov Ex. 46, but not admitted at trial.

# America
# God's Land of Liberty

## Governmental Structuring/Laws Thereof

Christopher "Kit" Arthur

5/7/2021

## Index

The Law ................................................................................................Pgs. 2-11

Article of Confederation ...............................................................Pgs. 12-15

Governing Rights and Acts of Redress for the People.............Pgs. 16-18

Term Limits for Elected Officials/War Claws............................Pgs. 19

Court Procedure/Proceedings......................................................Pgs. 20-21

Training Standards for Governmental Officials/Roles..............Pgs. 22-24

Related to this writing was a type-written document titled "My 1st Address to the nation: **Now is the Time.**" Two excerpts from the document:

The Declaration of Independence states, "But when a long train of abuses and usurpations, pursuing invariably the same Object evince a design to reduce them under absolute Despotism, it is their right, it is their duty, to throw off such Governments, and to provide new Guards for their future security."

(highlight in original) and:

My fellow Americans, now is the time, now is the time to fight back. Now is the time to show not just our enemy, but the world what we American can do. Now is the time to reach out to your neighbor, work together as a team to secure your communities. Take back your cities and counties. Now is the time for us to take back our country! Now is the time to drive our enemies into the ocean! We can do this and we will do this, because God is with us. And because we are Americans and that's what Americans do!

So link arms with your neighbors, pick up your guns, get out of your homes, and attack the enemy. Drive them out of our lands, off this continent, and into the ocean! This is possible because we work as one. This is possibly because we work as a team. This is possible because we are Americans! I do not promise you that this will be easy. I do not promise you life. But I do promise you that if we work as a team, if we work as one (just as our Father, the Son, and the Holy Ghost do); we will have a freedom the likes that we have never known in our life time. That with Gods good grace we will be victorious!

Second, a stack of papers was recovered regarding a bitter custody dispute between Arthur's wife and her ex-husband over two of their children who had spent a good bit of time with the ARTHURs.[6] It appeared that Mrs. Arthur's parental rights were terminated, and litigation had been ongoing. In those papers was discovered a series of writings that indicated a plot to retaliate against the presiding judge and attorneys in the custody case:

- Hand-written 11 question "interrogation" of the named Judge, asking how much he had been paid by the ex-husband's attorney and how many times, who else was "on the take," could he produce evidence of Mrs. ARTHUR's "guilt," and ended with reference to the America God's Land of Liberty, noting the law of tyranny in that document which was to be read to the judge near the end of the interrogation, then, as the law of God's Land of Liberty set out, to "allow God to find him guilty or otherwise pass judgment." The penalty for tyranny in America God's Land of Liberty was noted as branding, being stripped of all property, constitutional rights, and exiled or publicly hung by the neck until dead, the choice up to the presiding official.

- Hand-written list of license plate numbers and car descriptions, which appear to be employees/visitors at the judge's law firm, and the judge's office and home addresses;

---

[6] Provided in discovery and with trial exhibits, marked as Gov Ex 44, but not admitted at trial.

- Hand-drawn schematic/floor plan of what appears to be a law enforcement office, with rooms designated "evidence" "NARC," "Sheriff Office," and the like.

- 13 questions, type-written, entitled "questions for [the local sheriff]" (the sheriff apparently having executed the state order removing the two children from Mrs. Arthur's custody).

## II.   ARGUMENT

The defendant's Motion to Set Aside the verdict raises no new serious considerations for the Court, and the motion should be denied on the same grounds previously entered At D.E. 49.  Based on the defendant's conviction of § 842(p)(2)(B) and 844, the terrorism enhancement under USSG § 3A1.4 is patently applicable, as is the enhancement for use of a special skill.   Application of the terrorism enhancement, however, does result in a sentence greater than necessary to promote the purposes of sentencing and a downward variance is appropriate.

### A.  ARTHUR's convictions should stand.

Defendant first requests the Court set aside the jury's verdict on various constitutional grounds.  D.E. 106 at 5-10.  These arguments were briefed prior to trial by both parties (D.E. 41, 42, 44, and 45) and the Court denied the motions after thorough consideration of the issues.  D.E.  49.   The defendant adds one case from the Supreme Court, decided in 2023 to his authorities - *Counterman v. Colorado*, 600 U.S. 66 (2023).  *Counterman*, however, deals with only acts of speech – harassing and potentially threatening messages over Facebook to an intended recipient. *Counterman,* 600 U.S. at 69.   The defendant was not charged with nor convicted of making threats.   Rather, the defendant was convicted of teaching or demonstrating

16

the use of an explosive to another, while knowing that other person intended to use the teaching for or in furtherance of a federal crime of violence. This is not the making of a threat, and the "true threat" analysis is not applicable here.

For the reasons expressed by the Court in its Order at D.E. 49 as well as by the government at D.E. 42 and 45, the motion for vacatur should be denied.

### B. The terrorism enhancement applies.

Defendant argues the 12-point enhancement under U.S. Sentencing Guideline §3A1.4 should not apply. D.E. 106 at 11. USSG 3A1.4 permits a terrorism enhancement or upward departure in one of three scenarios. In the first scenario, the enhancement applies if the offense is a felony that involved or was intended to promote a federal crime of terrorism as defined under 18 U.S.C. § 2332b(g)(5). A federal crime of terrorism under that statute requires an offense that is a violation of a set of enumerated statutes and is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct. 18 U.S.C. § 2332b(g)(5). In the second scenario, an upward departure may be warranted if the underlying offense is not enumerated § 2332b(g)(5) but still was meant to influence or affect the conduct of the government by intimidation or coercion, or to retaliate against government conduct. USSG §3A1.4, cmt n.4.(A). The third scenario presents an increased sentence if the offense is an enumerated terrorism offense but the defendant's intent was to intimidate or coerce a civilian population. USSG §3A1.4, cmt n.4.(B). If the enhancement or upward departure applies, a defendant's offense level will be increased by 12 levels or up to level 32 if

17

the resulting offense level from the 12-level increase is less than that. USSG §3A1.4(a).

The defendant's case falls squarely in the first scenario. His felony conviction for distributing information related to explosives, destructive devices, and weapons of mass destruction knowing it was intended to be used for the murder or attempted murder of a law enforcement officer either involved or was intended to promote a federal crime of terrorism. The killing or attempted killing of officers and employees of the United States is a crime of terrorism. 18 U.S.C. §2332b(g)(5)(B)(i). Courts have recognized that "involve" means "to have within or as part of itself" and is satisfied either when the offense includes such a crime or the defendant's relevant conduct includes such a crime. *See United States v. Kobito*, 994 F.3d 696, 701 (4th Cir. 2021) (defining "involve"); *United States v. Awan*, 607 F.3d 306, 313–14 (2d Cir. 2010) (explaining that involve means to include and applies to the actual charged crime or conduct). Since one of the defendant's counts of conviction includes distributing information knowing it will be used to murder or attempt to murder officers and employees of the United States in violation of 18 U.S.C. §1114, his conviction involved a crime of terrorism.

Even if it did not "involve" a crime of terrorism, the defendant's conviction under 18 U.S.C. §842(p)(2)(B) intended to promote the killing of federal officers, a federal crime of terrorism. As explained in both *Kobito* and *Awan*, the terrorism adjustment is appropriate for convictions for unenumerated offenses where the promotion of an enumerated offense was at least one purpose or goal of the

18

defendant's offense of conviction or was "intended to help bring about, encourage, or contribute to" an enumerated offense. *See Kobito*, 994 F3d at 701–02; *Awan*, 607 F.3d at 313–14. Further, the terrorism enhancement has been applied in the context of domestic terrorism where the defendant's conduct made the commission of an enumerated offense "reasonably foreseeable to the defendant." *United States v. Graham*, 275 F.3d 490, 518–19 (6th Cir. 2001) (upholding application of USSG § 3A1.4 to a North American Militia defendant's conviction for conspiring to illegally possess machine guns and attack law enforcement where it was foreseeable that those crimes could result in the commission of at least six enumerated terrorism offenses). Here, at least one goal of the defendant's teaching the CHS how to build the Spiderweb was to create a "freaking death box" for ATF agents who came to the CHS's home. By teaching him how to build improvised explosive devices and fatal funnels, the defendant was encouraging and contributing to the murder or attempted murder of federal law enforcement officers. By telling the CHS he can either go lethal or non-lethal and describing spider defense as "stupid lethal," the defendant implicitly foresees the use of these tactics to kill the ATF agents. When coupled with his manual's exhortation to act whenever you perceive someone is infringing on your liberties and his YOUTUBE videos directing viewers to "F*** [law enforcement] up….This is your time to engage them. Through the door, through the wall, whatever….Start lighting them up" it is inescapable that one of the defendant's goals in teaching the CHS how to make improvised explosive devices was to kill federal law enforcement officers. By teaching the CHS how to build improvised explosive devices,

19

providing him parts to guide his building of those devices, and explaining how to set up those devices to make his home into a "freaking death trap" for ATF agents, Arthur promoted the murder or attempted murder of federal law enforcement while engaged in their official duties.

The terrorism enhancement does not apply automatically when a count of conviction involves or intends to promote an enumerated offense. *See United States v. Chandia*, 514 F.3d 365, 376 (4th Cir. 2008). Instead, the defendant must have the intent that the underlying felony was "calculated" to either "influence or affect the conduct of government by intimidation or coercion" or "to retaliate against government conduct." *Id.* "Calculated" has been understood as "devised with forethought" and planned to achieve the stated objective. *See United States v. Siddiqui*, 669 F.3d 690, 709 (2d Cir. 2009); *United States v. Stewart*, 590 F.3d 93, 137 (2d Cir. 2009). Many circuits, including the Fourth Circuit, interpret "calculated" as "nearly synonymous with intentional." *Siddiqui*, 669 F.3d at 709.

Here, the defendant's purpose in teaching the CHS about how to make IEDs was both to affect the conduct of government by coercion and to retaliate against government conduct. Even before the CHS and the defendant meets, the defendant tells the CHS that "[y]eah how to repel a militaristic force. Yeah well…with what they're talking about in the Biden administration that might be important hadn't it." When they do meet, the CHS tells the defendant that ATF agents have been to his home. After expressing amazement and the CHS telling the defendant that he wants to be prepared if they come back, the defendant then proceeds to explain how to create

the spiderweb and fatal funnels with IEDs and modifications to his home's structure. The crime he is promoting – murdering federal officers – is in direct response to ATF agents coming back to the CHS's home. It is undeniable that the defendant has the requisite forethought as his crime is devising and teaching the CHS how to create a set up that will murder federal officers. The defendant's crime, teaching the CHS how to make improvised explosive devices, gives the CHS the tools to retaliate against the government's return to his property.

The defendant's crime also aims to affect government conduct by coercion. That is clear when understood within the broader context of his company's entire purpose. As he testified, the defendant changed the course of his company to prepare for a possible war in the United States. In his YouTube Video "Gun Confiscations of Illegal Weapons 1775," the defendant laid out that "you are going to have to prepare yourself for war because that is exactly what we are in right now is a war." The defendant laid out his belief in his manuals that "[s]hould anyone" including Federal officers or employees "interfere in yours or anyone's else's ability to self-govern and have life and liberty – it is not just your right, but your duty to act." He explained "[t]hat's right, because you have this knowledge, God expects you to use it to end slavery, of every kind. To protect those who don't have this power or knowledge." His YouTube videos, manuals, and in-person training all identify his enemy: government. His abundant references to SWAT, Ruby Ridge, Waco, and the Bundys make that clear. All the IEDs, explosives, and tactics the defendant teaches to use against a "militaristic force" are meant for government employees. The defendant gears all his

21

wartime tactics towards government actors. That series, which is entitled "How to Repel a Trained Militaristic Force" is meant to coerce the government into stopping trying to infringe on freedom by enforcing gun laws like the red flag laws. That, though, is only one part of the defendant's larger plan. It is not enough just to repel the Government, that is just the "first battle." Instead, his students must

> Continue, take the fight straight to the enemy. Storm the capital, court house, or other local government buildings till you can round up all those responsible. Remember, tyranny is oppression of a few upon the many. If those running the government realize they are not safe and will be held accountable for their actions, they will be less willing to act outside the wishes of those they govern.

Within that broader context, the defendant's intent is clear in teaching the CHS over the course of three hours how to make IEDs and a fatal funnel for the ATF. He is trying to make sure the CHS has the "knowledge that is in [ARTHUR's] head and actual military tactics" so that the CHS "can survive the tyranny that we are under" from the present government.

For these reasons, the terrorism enhancement is correctly applied to the facts of this case.

### C. The enhancement for use of a special skill applies.

The defendant argues his skill in explosives was information any layman could have developed through research, as he did, and he should not be held accountable for having/using a "special skill." D.E. 106 at 12. This overlooks his law enforcement and military training, which enabled him to specifically understand the manner in which searches are undertaken, forces move forward in various scenarios, and

monetize it. "Infantry Tactics," "Close Quarter Combat," "Improvised Explosives," "How to Repel a Trained Militaristic Force," are just a few of the manuals and training modules put out by the defendant, which are largely predicated on specifically attained specialized knowledge – and was in fact his sales pitch for those items. In the videos discussed above, the defendant speaks at length about how his law enforcement and military training enabled him to put together these resources.

The two-point enhancement for use of a special skill is appropriate.

### D. A downward variance is may also be appropriate.

The government has no objections to the guideline range as calculated within the Presentence Report. In this case, however, the government recognizes the terrorism enhancement overwhelms the actual conduct, bringing the calculation of the sentence to roughly six times that which would otherwise be presented to the Court as the "heartland" of conduct. With no prior criminal history, and without the enhancement, the guideline range would have been 168 to 210 months. The terrorism enhancement brings that range to life imprisonment, reduced in this instance only because of the statutory maximum to which the defendant is exposed. Due to the specific nature and circumstances of the offense and the defendant's history and characteristics, some measure of downward variance may be appropriate. *See, United States v. Hasson,* 26 F.4th 610 (4th Cir.), *cert. denied*, 143 S. Ct. 310, 214 L. Ed. 2d 137 (2022); *United States v. Kobito*, 994 F.3d 696 (4th Cir. 2021); *United States v. Stein*, 985 F.3d 1254 (10th Cir. 2021); and *United States v. Hassan*, 742 F.3d 104 (4th Cir. 2014).

### III. CONCLUSION

For the above-stated reasons, the positions of defendant's sentencing memorandum seeking vacatur of his conviction(s) and articulating objections to the guidelines range calculated within the Presentence Report should be denied. That portion regarding a downward variance from the calculated guideline range may be appropriate, given the nature and circumstances of the offense and the defendant's history. That position notwithstanding, the government continues to advocate for a lengthy sentence.

Respectfully submitted this 20th day of May, 2024.


MICHAEL F. EASLEY, JR.
United States Attorney

 BY: */s/ Barbara D. Kocher*

| BARBARA D. KOCHER | LOGAN W. LILES |
|---|---|
| Assistant U. S. Attorney | Assistant U. S. Attorney |
| Criminal Division | Criminal Division |
| 150 Fayetteville St., Suite 2100 | 150 Fayetteville St., Suite 2100 |
| Raleigh, NC 27601 | Raleigh, NC 27601 |
| Telephone: (919) 856-4530 | Telephone: (919) 856-4530 |
| Facsimile: (919) 856-4828 | Facsimile: (919) 856-4828 |
| E-mail: Barb.Kocher@usdoj.gov | E-mail: Logan.Liles@usdoj.gov |
| N.C. State Bar No. 16360 | N.C. State Bar No. 47888 |

<u>CERTIFICATE OF SERVICE</u>

I hereby certify on 20th day of May, 2024, I caused a copy of the foregoing to be filed within CM/ECF, which in turn will cause service upon counsel for defendant.

Edward D. Gray
Attorney for Defendant
Assistant Federal Public Defender
150 Fayetteville St Suite 450
Raleigh, NC 27601-1461


BY:  */s/ Barbara D. Kocher*
BARBARA D. KOCHER
Assistant U. S. Attorney
Criminal Division
150 Fayetteville St., Suite 2100
Raleigh, NC 27601
Telephone: (919) 856-4530
Facsimile: (919) 856-4828
E-mail:  Barb.Kocher@usdoj.gov
N.C. State Bar No. 16360

LOGAN W. LILES
Assistant U. S. Attorney
Criminal Division
150 Fayetteville St., Suite 2100
Raleigh, NC 27601
Telephone: (919) 856-4530
Facsimile: (919) 856-4828
E-mail:  Logan.Liles@usdoj.gov
N.C. State Bar No. 47888